1

2

3

4

5

6

7

8 **UNITED STATES DISTRICT COURT**

9 **EASTERN DISTRICT OF CALIFORNIA**

10

| | |
|---|---|
| 11   LUIS M. SALAS RAZO, on his own behalf of and all others similarly situated, | ) Case No.: 1:20-cv-0172 JLT HBK |
| 12 | ) ) ORDER GRANTING PLAINTIFF'S MOTION |
|          Plaintiff, | ) FOR FINAL APPROVAL OF THE CLASS |
| 13 | ) SETTLEMENT |
| | ) (Doc. 85) |
| 14       v. | ) ) ORDER GRANTING IN PART PLAINTIFF'S |
| 15   AT&T MOBILITY SERVICES, LLC, et al., | ) MOTION FOR SERVICE AWARD |
| | ) (Doc. 83) |
| 16          Defendants. | ) ) ORDER GRANTING PLAINTIFF'S MOTION |
| 17 | ) FOR ATTORNEYS' FEES AND COSTS |
| | ) (Doc. 84) |
| 18 | ) |

19        Luis Salas Razo asserts AT&T Mobility Services failed to comply with California's wage and

20 hour laws by failing to pay all wages due and provide proper meal and rest breaks.  Razo now seeks

21 final approval of a settlement reached in this action. (Doc. 85.)  In addition, Plaintiffs seek attorney's

22 fees and costs from the settlement fund, costs for settlement administration, and a service payment for

23 the class representative. (Docs. 83, 84.)  Defendant does not oppose these requests, and no class

24 member submitted objections to the settlement terms.  The Court found the matters suitable for decision

25 without oral arguments pursuant to Local Rule 230(g), and the hearing for final approval was vacated.

26        Because Razo carries the burden to demonstrate certification of the Settlement Class is

27 appropriate under Rule 23 of the Federal Rules of Civil Procedure—and the terms of the settlement are

28 fair, reasonable, and adequate—the request for final approval of the Settlement is **GRANTED**.  In

addition, the request for attorney fees is **GRANTED** in the amount of $**191,666.67**; costs are awarded in the amount of $**4,747.10**; and settlement administration costs are granted in the amount of $**27,047.00**.  Razo's service award payment is **GRANTED** in the modified amount of $**5,000.00**.

## BACKGROUND

Razo was employed as a sales representative at the AT&T Mobility Store located in Madera, California.  (Doc. 41 at 4, ¶ 11.)  Razo asserts he worked for AT&T "for approximately eleven years" until his termination in June 2018.  (*Id.*)  He alleges AT&T "routinely failed to properly calculate the overtime and double time rate of pay."  (*Id.* at 6, ¶ 25.)  Razo asserts AT&T "failed to include its employees' total compensation including bonuses and commissions when calculating the regular rate for the purposes of determining overtime wages owed and thus routinely underpaid employees for overtime wages owed."  (*Id.*)  Razo contends this underpayment was "evidenced in [his] paycheck and accompanying wage statement issued June 13, 2018."  (*Id.*, ¶ 26.)

He alleges the wage statements also "failed to properly list all hours worked which again resulted in an underpayment of wages including overtime and double time wages to employees." (Doc. 41 at 6, ¶ 27.)  He contends, "[t]his resulted in failure to pay wages for all hours worked at appropriate rates, and overtime violations for work performed over eight (8) hours per day and/or forty (40) hours per week."  (*Id.*)  For example, Razo asserts his wage statement from June 13, 2018, "incorrectly reflects that the total hours worked because the hours associated with all of the line items add up to 106.08, but the total hours worked line item only lists 81.98 hours."  (*Id.* at 7, ¶ 27.)

Razo asserts he and others "received paychecks without proper wages, as meal period premiums were not paid at the proper rate, and the regular rate of pay was miscalculated."  (Doc. 41 at 7, ¶ 28.)  Razo contends AT&T paid premiums for missed meal periods at his "base hourly rate, rather than the regular rate of pay."  (*Id.*)  According to Razo, the miscalculation was "evidenced in [his] paycheck and accompanying wage statement issued June 1, 2018, which shows the untaken meal break premium is paid at [the] base hourly rate," without incorporating his commission in the premium rate paid.  (*Id.*)

Razo contends "on routine basis he and all other aggrieved employees received wage statements in violation of Labor Code §226, as hours and rates were not properly shown on wage

statements." (Doc. 41 at 7, ¶ 29 (emphasis omitted).) He alleges, "where there are payments for items such as cash awards, commission, taxable non-cash-awards, miscellaneous payment, or overtime 'true up' payments, there are no specific details as to rate or hours in the description or analysis that make up the payment." (*Id.*) He asserts the wage statements also violated California law because: "premium pay for meal period violations were paid at the … base hourly rate, rather than his regular rate of pay; the total hours listed are incorrect because the hours associated with the wage statement's line items exceed the number of total hours worked listed; and the wage statements list improper overtime rates because [AT&T] omitted items such as 'COMMISSION (MOBILITY)' when calculating its employee's regular rate of pay." (*Id.* at 7-8, ¶ 31.)

According to Razo, due to the miscalculated wages, AT&T also failed "to pay for all wages due prior to termination." (Doc. 41 at 8, ¶ 32.) In addition, Razo alleges that his "last day of work was in June 2018, but since such date four additional payments were made with the latest payment made as late as August 2018 well more than thirty (30) days after he ceased employment." (*Id.*, ¶ 35.) He reports these "payments consisted of the final payment of wages described as (1) Cash Awards, (2) Commission, (3) Taxable non-cash Awards, (4) Misc. Payment, and (5) recalculation of overtime differential pay." (*Id.* at 9, ¶ 36.) Razo contends that AT&T "knew or should have known, that all other employees, including Plaintiff, were entitled to receive all wages at appropriate rates, all overtime at appropriate rates, and all commissions due at the time their employment ceased," and knowingly and willfully failed to pay the wages due upon termination. (*Id.*, ¶¶ 36-37.)

On May 29, 2019, Razo provided notice to the Labor and Workforce Development Agency and AT&T "of the specific provisions of the California Labor Code alleged to have been violated, including the facts and theories to support the alleged violations." (Doc. 41 at 9, ¶ 42 (emphasis omitted).) He asserts the LWDA did not respond to the notice. (*Id.*, ¶ 43.)

On August 27, 2019, Razo initiated this action by filing a class complaint in Madera County Superior Court, Case No. MCV081925. (Doc. 1-4 at 5.) Razo filed an amended complaint in the state court on January 8, 2020. (Doc. 1-9.) AT&T initiated the matter before this Court by filing a notice of removal on January 31, 2020. (Doc. 1.) Razo further amended the pleadings on July 30, 2020, and October 15, 2021. (Docs. 9, 41.) The Third Amended Complaint is now the operative pleading.

Razo identifies the following causes of action in the TAC: (1) failure to pay for all hours worked; (2) failure to pay overtime wages; (3) failure to pay wages due at termination in violation of Cal. Labor Code §§ 201-203; (4) failure to furnish accurate, itemized wage statement in violation of Cal. Labor Code § 226; (5) unlawful and unfair conduct in violation of Cal. Bus. & Prof. Code § 17200, *et seq.*; and (6) civil penalties under California's Private Attorney General Act.  (Doc. 41 at 13-23.)  Razo asserted the claims were brought on behalf of himself and classes including:

1. "The Plaintiff Class": All persons who have been, or currently are, employed by Defendant and who held, or hold, job positions which Defendant have classified as "non-exempt" personnel in the State of California. (The Class Period is the period from August 27, 2015, through and including the date judgment is rendered in this matter).

2. "The Terminated Sub Class": All members of the Plaintiff Class whose employment ended during the Class Period (The Class Period is the period from August 27, 2015, through and including the date judgment is rendered in this matter).

(*Id.* at 10.)  AT&T filed its answer on October 28, 2021.  (Doc. 46.)

While this matter was pending, AT&T settled a separate class action addressing "the same claims" as those raised by Razo, in *Samuel Wallack, et al. v. AT&T Mobility Services*, *LLC*, San Bernardino County Superior Court Case No. CIVSB2117915.[1]  (Doc. 72 at 4; *see also* Doc. 50 at 2.)  The *Wallack* court denied Razo's motion to intervene.  (Doc. 49.)  The settlement in *Wallack* received final approval on March 18, 2022, and an "Amended Order Nunc Pro Tunc Granting Joint Motion for Final Approval of Class Action Settlement and Judgment" was issued on April 19, 2022.  The *Wallack* class included: "All persons who worked for AT&T Mobility Services LLC in the State of California, while classified as non-exempt, at any time from August 1, 2015 through November 2, 2021." (*Wallack*, Case No. CIVSB2117915, *Amended Order*, p. 2.)

---

[1] The Court may take judicial notice of a fact that "is not subject to reasonable dispute because it (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201; *see also United States v. Bernal-Obeso*, 989 F.2d 331, 333 (9th Cir. 1993). The official records of the Superior Court of San Bernardino County, as contained in the court's official website, are sources whose accuracy cannot reasonably be questioned, and judicial notice may be taken of documents on the website of a state court.  *See Harris v. County of Orange*, 682 F.3d 1126, 1132 (9th Cir. 2012) (judicial notice may be taken of "undisputed matters of public record, including documents on file in federal or state courts"); *O'Toole v. Northrop Grumman Corp.*, 499 F.3d 1218, 1225 (10th Cir. 2007) ("It is not uncommon for courts to take judicial notice of factual information found on the world wide web").  Accordingly, the Court takes judicial notice of the San Bernardino County Superior Court docket in Case No. CIVSB2117915, including the filing dates and documents publicly available.  This docket is available at https://www.sb-court.org, and through the court's online portal at https://cap.sb-court.org.

On March 8, 2022, Razo filed a motion for preliminary approval of the settlement with AT&T in this action.  (Doc. 72.)  Seeking approval, Razo acknowledged: "[o]nce the *Wallack* Court grant[ed] final approval, the only remaining claims in this matter will be those Razo has asserted on behalf of those who worked for Defendant in a non-exempt role in California from November 2, 2021, onwards." (*Id.* at 6.)  Thus, Razo and AT&T agreed settle the claims of a class defined as: "All persons who worked for AT&T Mobility Services LLC in the State of California, while classified as non-exempt, at any time from November 2, 2021, to the date the Court grants preliminary approval of this Settlement." (*Id.* at 7; *see also* Doc. 72-4 at 4, Settlement ¶ 2.)  However, the Court determined Razo was not a member of the proposed settlement class, and the conditional class could not be certified.  (Doc. 74.) Consequently, approval of the settlement was denied.

Following the Court's determination, the parties executed a "Revised Class Action and PAGA Action Settlement Agreement."  (Doc. 75-2.)  Razo filed an unopposed motion for approval of the parties' revised agreement, and the Court granted preliminary approval.  (Docs. 77, 80.)  The Court appointed Plaintiff Luis Salas Razo as the Class Representative and authorized his request for an enhancement reward up to $10,000.00 "subject to a petition and review" at the final approval stage. (Doc. 80 at 29.)  In addition, the Court appointed the firm of Bradley/Grombacher LLP as Class Counsel.  (*Id.*)  Class Counsel were authorized to seek "fees not to exceed 33 1/3% of the gross settlement amount and costs up to $10,000."  (*Id.*)  Finally, the Court appointed Atticus Administration LLC as the Settlement Administrator, and authorized costs up to $30,000 for the administration.  (*Id.*)

On October 6, 2022, the Court approved the Class Notice that conveyed this information.  (Doc. 82 at 1; *see also* Doc. 81-1.) The Class Notice informed Class Members of the class approved by the Court, claims and issues to be resolved, representation by counsel, how to be excluded from the class, deadlines for exclusion and objections, and the binding effect of a class judgment.  (*See* Doc. 81-1.)

On October 26, 2022, the Settlement Administrator mailed the Class Notice to 5,069 Class Members.  (Doc. 85-1 at 3, Bridley Decl. ¶ 6.)  The same date, the Settlement Administrator published the Class Notice on the website www.RazoATTSettlement.com, which also provided Class Members access to documents including the Settlement Agreement, Preliminary Approval Order, the Class Notice; identified important deadlines; and provided "answers to frequently asked questions." (*Id.*, at 4,

¶ 10.)  Each mailed Class Notice included an information sheet with the number of workweeks employed by AT&T during the Class Period—and time covered by the *Wallack* action, if applicable—and the Class Member's total estimated settlement share amount.  (*Id.* at 3, ¶ 6.)

Out of the 5,069 mailed Class Notices, 71 were initially returned as undeliverable.  (Doc. 85-1 at 3, Bridley Decl. ¶ 7.)  The Settlement Administrator received five forwarding addresses and located updated addresses for another 38 with tracing, which resulted in 43 notices being re-mailed.  (*Id.*)  Although six of the undeliverable Class Notices "were not traced because they were received at or after the Class Member response deadline," and the Settlement Administrator indicated tracing for those would be done "prior to the payments being mailed."  (*Id.* at 3-4, ¶ 7.)  In total, 5,032 Class Members —a total of 99.27% of the Settlement Class— received the Class Notice.  (*Id.* at 4, ¶ 7.)  The Settlement Administrator received six timely Requests for Exclusion from Kellen Shaw, Natasha Alaya, Isabel Ramos, Joshua Katzen, Sumanth Bharadwaj, and Cleveland Harris.  (Doc. 86 at 2, Bridley Supp Decl. ¶ 5; Doc. 85-1 at 4, ¶ 9.)  No objections were received by either the Settlement Administrator or the Court.  (*See id.*)

On November 30, 2020, Razo filed motions for final approval of the revised settlement agreement (Doc. 85), approval of a service award for Razo as the Class Representative (Doc. 83), and for attorneys' fees and costs (Doc. 84).  AT&T did not oppose any of the pending motions.

## **SETTLEMENT TERMS**

Pursuant to the proposed "Revised Class Action and PAGA Action Settlement Agreement ("the Settlement"), the parties agree to a gross settlement amount of $575,000.00 for a class including:

> All persons who either or both: (1) worked for AT&T Mobility Services LLC in the State of California, while classified as non-exempt, at any time from November 2, 2021, to the date the Court grants preliminary approval of this Settlement; and/or (2) filed a timely Request for Exclusion from the class action settlement in the matter of Samuel *Wallack, et. al. v. AT&T Mobility Services, LLC*, Case Number CIVSB2117915, pending in the Superior Court for the State of California, County of California County of San Bernardino.

(Doc. 75-2 at 3-4, ¶¶ 2, 6.)  The settlement funds are non-reversionary, and AT&T shall also pay "the employer's share of payroll taxes … separately from and in addition to the Gross Settlement Amount."  (*Id.* at 8, ¶ 22.)

## I.      Payment Terms

The parties agree the settlement fund shall cover payments to class members, including enhanced compensation to Razo as the Class Representative.  (Doc. 75-2 at 9, Settlement ¶¶ 22-24.) The Settlement also provides for payments to Class Counsel, the Settlement Administrator, and the California Labor & Workforce Development Agency.  (*Id.* at 5, ¶ 6.)  Specifically, the Settlement provides for the following payments from the gross settlement amount:

- • The Class Representative will receive a service payment up to $10,000.00;

- • Class counsel will receive $191,666.76 in attorneys' fees, which equals 33 1/3 % of the gross settlement amount, and expenses up to $10,000.00;

- • The California Labor and Workforce Development Agency shall receive $7,500.00 from the total PAGA payment of $10,000.00; and

- • The Settlement Administrator will receive up to $30,000.00 for fees and expenses.

(*Id.* at 5, 8-9, ¶¶ 6, 23-25.)  After these payments, the remaining money ("Net Settlement Amount") would be distributed as settlement shares to class members.  (*Id.* at 5, ¶ 10.)

Shares will be calculated on a *pro rata* basis for Class Members.  (Doc. 75-2 at 9, ¶ 26.)  The Settlement provides: "Each Class Member who does not timely opt-out of the settlement will receive a *pro rata* share of the Net Settlement Amount based on the number of weeks that he or she worked in each position covered by the Settlement from November 2, 2021 to the date of preliminary approval (the 'Class Member Payment')."  (*Id.*)  The Class Member Payment will include an individual's shares of the PAGA Settlement Amount under Cal. Lab. Code § 2699(i).  (*Id.*; *see also id.* at 4-5, ¶ 9.)

The appointed Settlement Administrator will distribute payment by mailing checks to all Class Members and Aggrieved Employees.  (Doc. 75-2 at 19-20, Settlement ¶ 40; *see also* Doc. 75 at 15.) Checks must be cashed within 90 days of the mailing.  (Doc. 75-2 at 20, ¶ 41; *see also* Doc. 75 at 15-16.)  If any check remains uncashed after the 90-period, the money does not revert to AT&T.  Rather, "the Settlement Administrator will distribute the unclaimed funds represented by the uncashed check to the California State Controller's Office, Unclaimed Property Division in the name of the Class Member, where the Class Member or Aggrieved Employee can later claim their funds."  (*Id.*)

## II.      Releases

The Settlement provides that Razo and Class Members, other than those who elect not to participate in the Settlement, shall release AT&T from claims.  (Doc. 75-2 at 10-11, ¶¶ 29-30.)  The releases for all Class Members and "Aggrieved Employees" under PAGA provide:

> **Class Members**. Upon the Court's final approval of this Settlement, the Class Members (other than those who timely and validly elected not to participate in the Settlement) fully release and discharge Defendant and the Released Parties of any and all known and unknown claims as alleged in, and that could have been alleged based on the facts of, the operative Third Amended Complaint. This includes, but is not limited to, statutory, constitutional, contractual or common law claims for wages, damages, unpaid costs or expenses, penalties, liquidated damages, punitive damages, interest, attorneys' fees, litigation costs, restitution, or equitable relief, arising out of or based upon any provision of the California Labor Code, California Industrial Welfare Commission Wage Orders, and California Business and Professions Code § 17200, *et seq*.; including, without limitation, the following categories of allegations, to the fullest extent such claims are releasable by law: (a) all claims for failure to pay wages, including overtime premium pay and the minimum wage; (b) all claims for the failure to provide meal and/or rest periods in accordance with applicable law, including payments equivalent to one hour of the employee's regular rate of pay for missed meal and/or rest period and alleged non-payment of wages for meal periods worked and not taken; (c) all claims for the alleged omission of any kind of remuneration when calculating an employee's regular rate of pay; and (d) any and all claims for recordkeeping or pay stub violations, claims for timely payment of wages and associated penalties, and all other civil and statutory penalties. The Class Members understand and agree that this release includes a good-faith compromise of disputed wage claims.
>
> **Aggrieved Employees**. Upon the final approval by the Court of this Settlement, and in consideration of the PAGA Settlement Amount, Luis M. Salas Razo-on behalf of the State of California, the LWDA, and the Aggrieved Employees-releases and discharges Defendant and the Released Parties of any and all known and unknown claims as alleged in, and that could have been alleged based on the facts of, the operative complaint. This includes, but is not limited to, all claims for penalties, attorneys' fees, litigation costs, restitution, or equitable relief, recoverable through PAGA and arising out of or based upon any provision of the California Labor Code or California Industrial Welfare Commission Wage Orders; including, without limitation, the following categories of allegations, to the fullest extent such claims are releasable by law: (a) all claims for failure to pay wages, including overtime premium pay and the minimum wage; (b) all claims for the failure to provide meal and/or rest periods in accordance with applicable law, including payments equivalent to one hour of the employee's regular rate of pay for missed meal and/or rest periods and alleged non-payment of wages for meal periods worked and not taken; (c) all claims for the alleged omission of any kind of remuneration when calculating an employee's regular rate of pay; and (d) any and all claims for recordkeeping or pay stub violations, claims for timely payment of wages and associated penalties, and all other civil and statutory penalties.

(*Id.* at 10-13, Settlement ¶¶ 30-31.)

The release for Razo encompasses more claims than those identified for Settlement Class Members, because he agreed to release any claims known and unknown against AT&T, not just those claims constrained to the facts alleged in this lawsuit.  Razo's release provides:

> In consideration of the Service Payment to Razo, his Settlement payments, and the other terms and conditions of the Settlement, Luis M. Salas Razo hereby releases any and all of his known and unknown claims against Defendant and any of Defendant's present and former parents, subsidiaries and affiliated companies or entities, and their respective officers, directors, employees, partners, shareholders and agents, and any other successors, assigns and legal representatives and its related persons and entities ("Released Parties") and waives the protection of California Civil Code section 1542.  Razo understands and agrees that this release includes a good-faith compromise of disputed wage claims.

(*Id.* at 10, Settlement ¶ 29.)  Thus, claims released by Razo—but not the Settlement Class Members— include any claims arising under the Americans with Disabilities Act, Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 1981, and the Employee Retirement Income Security Act.

**III.     Objections and Exclusion Procedure**

Class Members were not required to take any action to receive their settlement shares, and Class Members were informed they would receive a share unless they requested exclusion.  (*See* Doc. 81-1 at 4.)  Any Class Member who wished to do so had an opportunity to submit objections or elect not to participate in the Settlement.  (Doc. 75-2 at 15-16, Settlement ¶ 34.)  The Class Notice explained the procedures to object to the terms and/or request exclusion.  (Doc. 81-1 at 4-5, 7.)  Individuals were informed any objections or requests for exclusion were to be postmarked no later than November 25, 2022.  (*Id.* at 4, 7; *see also* Doc. 86 at 2, Bridley Supp. Decl. ¶ 4.)

**IV.     Service of the Class Notice Packets and Responses Received**

Bryn Bridley, the Director of Project Management of Atticus Administration, reports the Class Notice was mailed via the United States Postal Service on October 26, 2022.  (Doc. 85-1 at 3, Bridley Decl. ¶ 6.)  Ms. Bridley reports the Settlement Administrator received six requests for exclusion from Kellen Shaw, Natasha Alaya, Isabel Ramos, Joshua Katzen, Sumanth Bharadwaj, and Cleveland Harris.  (Doc. 86 at 2, Bridley Supp Decl. ¶ 5; Doc. 85-1 at 4, ¶ 9.)  These individuals will not receive shares from the Settlement, and are excluded from the Settlement Class.  In addition, Ms. Bridley reports that

9

1  the Settlement Adminstrator did not receive any objections to the Settlement terms.  (Doc. 86 at 2,

2  Bridley Supp Decl. ¶ 5.)  Likewise, the Court did not receive any objections to the Settlement.

3  <u>**APPROVAL OF A CLASS SETTLEMENT**</u>

4  When parties settle the action prior to class certification, the Court has an obligation to "peruse

5  the proposed compromise to ratify both the propriety of the certification and the fairness of the

6  settlement."  *Staton v. Boeing Co.*, 327 F.3d 938, 952 (9th Cir. 2003).  Approval of a class settlement is

7  generally a two-step process.  First, the Court must assess whether a class exists.  *Id.* (citing *Amchem*

8  *Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997)).  Second, the Court must "determine whether the

9  proposed settlement is fundamentally fair, adequate, and reasonable."  *Id.* (citing *Hanlon v. Chrysler*

10 *Corp.*, 150 F.3d 1011, 1026 (9th Cir. 2998)).  The decision to approve or reject a settlement is within

11 the Court's discretion.  *Hanlon*, 150 F.3d at 1026.

12 **I.      Certification of the Settlement Class[2]**

13 Class certification is governed by Rule 23 of the Federal Rules of Civil Procedure, which

14 provides that "[o]ne or more members of a class may sue or be sued as representative parties on behalf

15 of all."  Fed. R. Civ. P. 23(a).  Under the terms of the Settlement, the proposed class is comprised of:

16
> All persons who either or both: (1) worked for AT&T Mobility Services
> LLC in the State of California, while classified as non-exempt, at any time
17 > from November 2, 2021, to the date the Court grants preliminary approval
> of this Settlement; and/or (2) filed a timely Request for Exclusion from the
18 > class action settlement in the matter of Samuel *Wallack, et. al. v. AT&T*
> *Mobility Services, LLC*, Case Number CIVSB2117915, pending in the
19 > Superior Court for the State of California, County of California County of
> San Bernardino.
20

21 (Doc. 75-2 at 3, ¶ 2.)

22 Parties seeking class certification bear the burden of demonstrating the elements of Rule 23(a)

23 are satisfied, and "must affirmatively demonstrate … compliance with the Rule."  *Wal-Mart Stores,*

24 *Inc. v. Dukes*, 564 U.S. 338, 350 (2011); *Doninger v. Pacific Northwest Bell, Inc.*, 563 F.2d 1304, 1308

25 (9th Cir. 1977).  If an action meets the prerequisites of Rule 23(a), the Court must consider whether the

26 class is maintainable under one or more of the three alternatives identified in Rule 23(b).  *Narouz v.*

27

28 ---
[2] Because the class was only conditionally certified upon preliminary approval of the Settlement, final certification of the Settlement Class is required.

1   *Charter Communs., LLC*, 591 F.3d 1261, 1266 (9th Cir. 2010).

2   **A.   Requirements of Rule 23(a)**

3   The prerequisites of Rule 23(a) "effectively limit the class claims to those fairly encompassed

4   by the named plaintiff's claims." *General Telephone Co. of the Southwest. v. Falcon*, 457 U.S. 147,

5   155-56 (1982). Certification of a class is proper if:

6   (1) the class is so numerous that joinder of all members is impracticable;
    (2) there are questions of law or fact common to the class; (3) the claims or
7   defenses of the representative parties are typical of the claims or defenses
    of the class; and (4) the representative parties will fairly and adequately
8   protect the interests of the class.

9   Fed. R. Civ. P. 23(a). These prerequisites are generally referred to as numerosity, commonality,

10  typicality, and adequacy of representation. *Falcon*, 457 U.S. at 156.

11  1.   Numerosity

12  This prerequisite requires the Court to consider "specific facts of each case and imposes no

13  absolute limitations." *General Telephone Co. v. EEOC*, 446 U.S. 318, 330 (1980). Although there is

14  not a specific threshold, joining more than one hundred individual plaintiffs is impracticable. *See*

15  *Immigrant Assistance Project of Los Angeles Cnt. Fed'n of Labor v. INS*, 306 F.3d 842, 869 (9th Cir.

16  2002) (finding the numerosity requirement satisfied solely based on "the number of ascertained class

17  members"); *see also Gay v. Waiters' & Dairy Lunchmen's Union*, 549 F.2d 1330, 1332 n.7 (9th Cir.

18  1977) (a proposed class with 110 members "clearly [included] a sufficient number to meet the

19  numerosity requirements").

20  In seeking preliminary approval, Razo estimated there were approximately 3,900 individuals

21  who could qualify as members of the Settlement Class. (Doc. 75 at 18.) Razo now reports that "[a]s

22  of September 21, 2022, the date preliminary approval was granted, this number increased to 5,069."

23  (Doc. 85 at 10, n.3.) Based upon the number of identified Class Members, joinder of all identified

24  class members as plaintiffs is impracticable, and the numerosity requirement is satisfied.

25  2.   Commonality

26  Rule 23(a) requires "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2).

27  To satisfy the commonality requirement, the plaintiff must demonstrate common points of facts and

28  law. *See Wal-Mart Stores*, 564 U.S. at 350. Thus, "commonality requires that the class members'

1   claims depend upon a common contention such that determination of its truth or falsity will resolve an

2   issue that is central to the validity of each claim in one stroke," and the "plaintiff must demonstrate the

3   capacity of classwide proceedings to generate common answers to common questions of law or fact

4   that are apt to drive the resolution of the litigation."  *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581,

5   588 (9th Cir. 2012) (internal quotation marks, citations omitted).

6          Razo asserts the commonality requirement is satisfied because "the claims of the Settlement

7   Class Members turn upon answers to overarching common questions regarding Defendant's policies

8   and procedures that are capable of class-wide resolution for settlement purposes."  (Doc. 85 at 11.)

9   According to Razo, common issues include:

> (1) whether Defendant's timekeeping policies resulted in compensable off-the-clock work and subsequent failure to pay all regular and overtime hours worked; (2) whether Defendant's omission of certain types of remuneration when calculating its employee's regular rate of pay resulting in a failure to pay all wages owed; (3) whether Defendant provided its employees with all required meal and rest periods; (4) whether Defendant paid its employees a penalty equivalent to one hour of their regular rate of compensation whenever that worker missed a meal or rest period; (5) whether Defendant failed to pay all owed wages timely; and (6) whether Defendant failed to provide employees with wage statements compliant with California law.

16  (*Id.*)  Because it appears resolution of the issues—including whether AT&T's policies violated

17  California wage and hour law—apply to the claims of each of the Class Members, the Court finds the

18  commonality requirement is satisfied.

19                     3.     Typicality

20         This requirement demands that the "claims or defenses of the representative parties are typical

21  of the claims or defenses of the class."  Fed. R. Civ. P. 23(a)(3).  A claim or defense is not required to

22  be identical, but rather "reasonably coextensive" with those of the absent class members.  *Hanlon*, 150

23  F.3d at 1020.  "The test of typicality is whether other members have the same or similar injury, whether

24  the action is based on conduct which is not unique to the named plaintiffs, and whether other class

25  members have been injured by the same course of conduct."  *Hanon v. Dataproducts Corp.*, 976 F.2d

26  497, 508 (9th Cir. 1992) (internal quotation marks, citation omitted); *see also Kayes v. Pac. Lumber

27  Co.*, 51 F.3d 1449, 1463 (9th Cir. 1995) (the typicality requirement is satisfied when named plaintiffs

28  have the same claims as other members of the class and would not be subject to unique defenses).

1    Razo asserts the typicality requirement is satisfied because "[he] and the Class Members all

2    worked for AT&T Mobility as non- exempt employees in California locations." (Doc. 85 at 12.)  In

3    addition, Razo contends he and the Class Members "were all subject to the same allegedly non-

4    compliant policies and practices—namely, the failure to pay meal and rest period premiums at the

5    regular rate, which resulted in Labor Code violations from which Plaintiff and the Class are alleged to

6    have suffered similar injury." (*Id.*)  Because Razo was subjected to the same company policies and

7    wage payment procedures as the Settlement Class Members, the typicality requirement is satisfied for

8    purposes of settlement. *See Hanon*, 976 F.2d at 508; *Kayes*, 51 F.3d at 1463.

9                    4.    Adequacy of Representation

10    Absentee class members must be adequately represented for judgment to be binding upon

11    them. *Hansberry v. Lee*, 311 U.S. 32, 42-43 (1940).  The prerequisite is satisfied if the representative

12    party "will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4).

13    "[R]esolution of this issue requires that two questions be addressed: (a) do the named plaintiffs and

14    their counsel have any conflicts of interest with other class members and (b) will the named plaintiffs

15    and their counsel prosecute the action vigorously on behalf of the class?" *In re Mego Fin. Corp. Sec.*

16    *Litig.*, 213 F.3d 454, 462 (9th Cir. 2000) (citing *Hanlon*, 150 F.3d at 1020).

17                    a.    Class representative

18    AT&T did not oppose the appointment of Razo as Class Representative, "for settlement

19    purposes only." (*See* Doc. 75 at 19-20.)  Previously, Razo asserted he "litigated this case in good

20    faith" and "the interests of the Class Representative are aligned with those of the Class as they all

21    share a common interest in challenging the legality of the alleged policies and procedures on which the

22    claims are based." (*Id.* at 20.)  Neither party identified conflicts between Razo and the Settlement

23    Class members. (*See id.* at 19-20.)  Thus, it appears Razo has fairly and adequately represented the

24    interests of the Settlement Class.

25                    b.    Class Counsel

26    The law firm of Bradley/Grombacher LLP was appointed as counsel for the Settlement Class.

27    (Doc. 80 at 29.)  Kiley Grombacher reports the firm "is a national law firm with extensive experience

28    litigating wage and hour class and representative actions as well as complex consumer class actions."

1   (Doc. 84-1 at 9, ¶ 43.)  Counsel report the firm "litigated numerous class actions to favorable

2   settlements." (*Id.* at 10-11, ¶ 48.)

3         Ms. Grombacher reports she has been a member of the California Bar since 2006.  (Doc. 84-1 at

4   10, ¶ 44.)  She states she has worked in class action litigation for "more than a decade during which

5   time [she] litigated hundreds of class actions." (*Id.*)  Ms. Grombacher's experience includes arguing

6   "cases before trial courts and courts of appeal." (*Id.*, ¶ 46.)  In addition, Ms. Grombacher reports she

7   was "honored as a Rising Star and/or Super Lawyer in the area of class actions by Los Angeles

8   Magazine for multiple years including the current year." (*Id.*)

9         Marcus Bradley "has practiced law since 1994," and "has spent the majority of his time

10  representing workers in wage and hour matters" since about May 2000.  (Doc. 84-1 at 10, ¶ 47.)  He

11  has published work "on topics pertaining to litigating wage and hour class and representative actions…

12  in professional publications." (*Id.*)  In addition, "Mr. Bradley has been honored as a Super Lawyer in

13  the area of class actions by Los Angeles Magazine for multiple years including 2023." (*Id.*)

14        Ms. Grombacher reports that associates with Bradley/Grombacher, including Leslie Joyner and

15  Lirit King, also worked on this action.  (Doc. 84-1 at 16, ¶ 59.)  Ms. Joyner is a thirteenth-year

16  associate" at the firm, while Ms. King is a fourteenth- year associate.  (*Id.* at 14, ¶¶ 51-52.)  Ms. Joyner

17  "was the primary associate assigned to this case." (*Id.* at 14, ¶ 15.)  "Ms. Joyner's practice has focused

18  on complex litigation in federal and state courts, including wage and hour violations, discrimination

19  claims, consumer rights, employment class actions and consumer class actions." (*Id.*, ¶ 51.) Ms. King

20  also focuses on employment law.  (*Id.*, ¶ 52.)

21        The reported experience of the attorneys who worked on this action—as well as the reputation

22  of the named partners based upon their recognition as "Super Laywers" in the area of class actions—

23  support a conclusion that counsel prosecuted the action vigorously on behalf of the Settlement Class.

24  Thus, the Court finds Bradley/ Grombacher LLP satisfies the adequacy requirement.

25        **B.      Certification under Rule 23(b)(3)**

26        As noted above, once the requirements of Rule 23(a) are satisfied, a class may only be certified

27  if it is maintainable under Rule 23(b).  Fed. R. Civ. P. 23(b); *see also Narouz*, 591 F.3d at 1266.  Razo

28  asserts certification of the settlement class is appropriate under Rule 23(b)(3), which requires a finding

1   that (1) "the questions of law or fact common to class members predominate over any questions

2   affecting only individual members," and (2) "a class action is superior to other available methods for

3   fairly and efficiently adjudicating the controversy."  (*See* Doc. 85 at 12-13.)

4           1.     Predominance

5        The predominance inquiry focuses on "the relationship between the common and individual

6   issues" and "tests whether proposed classes are sufficiently cohesive to warrant adjudication by

7   representation."  *Hanlon*, 150 F.3d at 1022 (citing *Amchem Prods.*, 521 U.S. at 623).  "[A] central

8   concern of the Rule 23(b)(3) predominance test is whether 'adjudication of common issues will help

9   achieve judicial economy.'"  *Vinole v. Countrywide Home Loans,* 571 F.3d 935, 944 (9th Cir. 2009)

10  (quoting *Zinser v. Accufix Research Inst.*, 253 F.3d 1180, 1189 (9th Cir. 2001)).

11       Razo asserts the predominance requirement is satisfied because "[t]he claims in this litigation

12  are based on allegedly common, class-wide policies and procedures, and liability could be determined

13  on a class-wide basis."  (Doc. 85 at 13, citing *Brinker Restaurant Corp. v. Superior Court*, 53 Cal.4th

14  1004, 1003 (2012).)  According to Razo, "the overarching issue in this case is whether AT&T's

15  uniform practice of failing to pay meal and rest period premiums at the regular rate[] resulted in Labor

16  Code violations."  (*Id.*)  Thus, Razo contends the Settlement Class "is sufficiently cohesive to warrant

17  adjudication by representation." (*Id.* at 13.)  Based upon the information provided, the Court finds

18  adjudication of the claims via a class action promotes judicial economy, because the claims are based

19  upon company, class-wide policies and procedures.

20          2.     Superiority

21       The superiority inquiry requires a determination of "whether objectives of the particular class

22  action procedure will be achieved in the particular case."  *Hanlon*, 150 F.3d at 1023 (citation omitted).

23  This tests whether "class litigation of common issues will reduce litigation costs and promote greater

24  efficiency."  *Valentino v. Carter-Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996).  Pursuant to Rule

25  23(b)(3), the Court must consider four non-exclusive factors to determine whether a class is a superior

26  method of adjudication, including (1) interests of class members, (2) other pending litigation, (3) the

27  desirability of concentrating claims in one forum, and (4) difficulties with the management of the class

28  action.  *Id.; see also James v. Uber Techs. Inc.*, 338 F.R.D. 123, 143 (C.D. Cal. 2021) (indicating the

1    factors identified in Rule 12(b)(3) address the "superiority" analysis).

2                    a.      *Class members' interest in individual litigation*

3          The Court is directed to consider "the class members' interests in individually controlling the

4    prosecution or defense of separate actions."  Fed. R. Civ. P. 23(b)(3)(A).  This factor is most relevant

5    when class members "suffered sizeable damages or [have] an emotional stake in the litigation."

6    *McKenzie v. Fed. Express Corp.*, 275 F.R.D. 290, 301 (C.D. Cal. 2011).  The Ninth Circuit explained

7    that "[w]here damages suffered by each putative class member are not large, this factor weighs in

8    favor of certifying a class action."  *Zinser*, 253 F.3d at 1190.

9          In this case, only six individuals requested exclusion from the Settlement Class.  (Doc. 86 at 2,

10   Bridley Supp Decl. ¶ 5.)  There is no indication that the remaining 5,026 Class Members have any

11   desire to control the prosecution of this action or proceed with individual litigation.  (*See id.*; *see also*

12   Doc. 85-1 at 4, Bridley Decl. ¶ 7.)  Further, the damages suffered by Class Members are not

13   particularly large, as the anticipated "Class Member Payments range from $1.97 to $701.03," with an

14   average payment of $65.47.  (Doc. 85-1 at 5, Bridley Decl. ¶ 13.)  It is unlikely that individuals would

15   pursue small claims.  *See Wright v. Linkus Enters.*, 259 F.R.D. 468, 474 (E.D. Cal. 2009).  Therefore,

16   this factor weighs in favor of certification.

17                    b.      *Other litigation*

18         Next, the Court considers "the extent and nature of any litigation concerning the controversy

19   already begun by or against class members."  Fed. R. Civ. P. 23(b)(3)(B).  While this matter was

20   pending, AT&T settled a separate class action addressing "the same claims" as those raised by Razo,

21   in *Samuel Wallack, et al. v. AT&T Mobility Services*, *LLC*, San Bernardino County Superior Court

22   Case No. CIVSB2117915.  (Doc. 72 at 4; *see also* Doc. 50 at 2.)  The *Wallack* class included: "All

23   persons who worked for AT&T Mobility Services LLC in the State of California, while classified as

24   non-exempt, at any time from August 1, 2015 through November 2, 2021."  (*Wallack*, Case No.

25   CIVSB2117915, *Amended Order*, p. 2.)  Thus, the parties agreed to settle the pending matter for

26   claims following November 2, 2021.  (*See* Doc. 75-2 at 3, Settlement ¶ 2.)  Although this pending

27   matter includes individuals who opted out of *Wallack*, there is no evidence this is a significant number

28   of Class Members.  Accordingly, this factor does not weigh against certification.

1

           *c.*      *Concentration in one forum*

2         Third, the Court must consider "the desirability or undesirability of concentrating the litigation

3 of the claims in the particular forum."  Fed. R. Civ. P. 23(b)(3)(C).  There is no suggestion the Eastern

4 District is an undesirable forum for the matter, which raises wage and hour claims under California

5 law on behalf of employees throughout the state.  *See United States ex rel. Terry v. Wasatch*

6 *Advantage Grp., LLC*, 327 F.R.D. 395, 419 (E.D. Cal. 2018) (finding the factor weighed in favor of

7 certification where the proposed class was compromised of individuals located in California and

8 involved "California state law claims").  Moreover, as this Court previously explained, when "parties

9 … agreed on a proposed Settlement Agreement, the desirability of concentrating the litigation in one

10 forum is obvious." *Wright*, 259 F.R.D. at 474 (internal quotation marks, citation omitted).  Therefore,

11 this factor weighs in favor of certification.

12           *d.*      *Management of the action*

13         Finally, the Court must consider "the likely difficulties in managing a class action."  Fed. R.

14 Civ. P. 23(b)(3)(D).  The Supreme Court explained that, in general, "manageability … encompasses

15 the whole range of practical problems that may render the class format inappropriate for a particular

16 suit." *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 164 (1974).  Because the parties have reached a

17 settlement agreement, it does not appear there are any problems with managing the action.  Further,

18 the Court need not speculate as to manageability if the case proceeded to trial.  *See Amchem Prods.*,

19 521 521 U.S. at 620 ("with a request for settlement-only class certification, a district court need not

20 inquire whether the case, if tried, would present intractable management problems").  Consequently,

21 this factor weighs in favor of certification.

22 **II.     Approval of the Settlement Terms**

23         Settlement of a class action requires approval of the Court, which may be granted "only after a

24 hearing and on finding that [the settlement] is fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).

25 Approval is required to ensure settlement is consistent with the plaintiff's fiduciary obligations to the

26 class.  *See Ficalora v. Lockheed Cal. Co.*, 751 F.2d 995, 996 (9th Cir. 1985).  Toward that end,

27 "Congress and the Supreme Court amended Rule 23(e) to set forth specific factors to consider in

28 determining whether a settlement is 'fair, reasonable, and adequate.'"  *Briseño v. Henderson*, 998 F.3d

1014, 1023 (9th Cir. 2021); *see also* Fed. R. Civ. P. 23(e)(2) (effective Dec. 1, 2018).  Rule 23(e)(2) now directs the Court to consider whether:

> (A) the class representatives and class counsel have adequately represented the class;
> (B) the proposal was negotiated at arm's length;
> (C) the relief provided for the class is adequate, taking into account:
>> (i) the costs, risks, and delay of trial and appeal;
>> (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims;
>> (iii) the terms of any proposed award of attorney's fees, including timing of payment; and
>> (iv) any agreement required to be identified under Rule 23(e)(3); and
> (D) the proposal treats class members equitably relative to each other.

Fed. R. Civ. P. 23(e)(2); *see also Briseño*, 998 F.3d at 1023-24.  The Ninth Circuit determined this revision to Rule 23 requires courts "to go beyond [its] precedent." *Briseño*, 998 F.3d at 1026.[3]

## A.    Representation of the Class

To determine adequacy of representation under Rule 23(e)(2), the Court may consider whether the interests of the named plaintiff are "aligned with the interests of the Class Members." *See Cottle v. Plaid Inc.*, 240 F.R.D. 356, 376 (N.D. Cal. 2021).  A finding that "Class Counsel are experienced and competent" supports a conclusion that the class is adequately represented. *Id.*; *see also In re Pac. Enters. Sec. Litig.,* 47 F.3d 373, 378 (9th Cir. 1995) ("Parties represented by competent counsel are better positioned than courts to produce a settlement that fairly reflects each party's expected outcome in litigation.").  Thus, the adequacy analysis under Rule 23(e)(2) is "redundant of the requirements of Rule 23(a)(4) and Rule 23(g), respectively." *Hudson v. Libre Tech., Inc.,* 2020 WL 2467060, at *5 (S.D. Cal. May 13, 2020) (quoting Rubenstein, 4 Newberg on Class Actions § 13:48 (5th ed.)).

---

[3] Previously, the Ninth Circuit identified several factors to determine whether a settlement agreement meets these standards, including:

> the strength of plaintiff's case; the risk, expense, complexity, and likely duration of further litigation; the risk of maintaining class action status throughout the trial; the amount offered in settlement; the extent of discovery completed, and the stage of the proceedings; the experience and views of counsel; the presence of a governmental participant; and the reaction of the class members to the proposed settlement.

*Staton*, 327 F.3d at 959 (citation omitted).  Although Plaintiff refers to the factors under the Ninth Circuit precedent in th emotion for final approval, (Doc. 85 at 15), the Court focuses its analysis on the factors now enumerated in Rule 23. *See Briseño*, 998 F.3d at 1026; *see also Feltzs v. Cox Communications Cal., LLC.*, 2022 WL 2079144, at *7 (C.D. Cal. Mar. 3, 2022) ("The goal of [amended Rule 23(e)] is … to focus the [district] court and the lawyers on the core concerns of procedure and substance that should guide the decision whether to approve the proposal") (quoting Fed. R. Civ. P. 23(e)(2), 2018 Advisory Committee Notes).

Razo contends his interests are aligned with the Class Members, because they "share a common interest in challenging the legality of the alleged policies and procedures on which the claims are based." (Doc. 75 at 20; *see also* Doc. 85 at 12.) In addition, Class Counsel are clearly experienced in class action litigation. (*See* Doc. 84-1 at 9-14, Grombacher Decl. ¶¶ 43-52; *see also* Doc. 71-5 at 5-10, ¶¶ 19-28.) Because Razo carried the burden to show the adequacy prerequisite was satisfied under Rule 23(a), the Court finds the requirement under Rule 23(e)(2) is also satisfied. *See Flores v. Dart Container Corp.*, 2021 WL 1985440, at *5 (E.D. Cal. May 17, 2021) ("Because the Court has found that the proposed class satisfies Rule 23(a)(4) for purposes of class certification, the adequacy factor under Rule 23(e)(2)(A) is also met").

## B. Negotiation of the Settlement

Under Rule 23, the Court must consider whether "the proposal was negotiated at arm's length." Fed. R. Civ. P. 23(e)(2)(B). The Ninth Circuit also "put[s] a good deal of stock in the product of an arms-length, non-collusive, negotiated resolution" in evaluating a proposed class action settlement. *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 967 (9th Cir. 2009). The inquiry of collusion addresses the possibility that the settlement agreement is the result of either "overt misconduct by the negotiators" or improper incentives of class members at the expense of others. *Staton*, 327 F.3d at 960. The Ninth Circuit observed that "settlement class actions present unique due process concerns for absent class members" because the "inherent risk is that class counsel may collude with the defendants, tacitly reducing the overall settlement in return for a higher attorney's fee." *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) (internal quotation marks, citations omitted). Therefore, the Court must consider whether the process by which the parties arrived at their settlement is truly the product of arm's length bargaining—as Razo asserts (Doc. 85 at 16)— or the product of collusion or fraud. *Millan v. Cascade Water Servs., Inc.*, 310 F.R.D. 593, 613 (E.D. Cal. 2015).

Where a class action settlement agreement is reached prior to a class being certified, district courts must be watchful "not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations." *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d at 94; *see also Briseño*, 998 F.3d at 1023. These "more subtle signs" include: (1) "when counsel receive a disproportionate distribution

of the settlement, or when the class receives no monetary distribution but class counsel are amply rewarded"; (2) the existence of a "clear sailing" arrangement, which provides "for the payment of attorneys' fees separate and apart from class funds" and "carries the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class"; and (3) "when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund."  *Id.* (internal quotations, citations omitted).

> 1.      Whether there is a disproportionate distribution to counsel

The Settlement provides that Class counsel may request attorneys' fees up to $ 191,666.67, which is one third of the gross settlement fund.  (Doc. 75-2 at 8, Settlement ¶ 23.)  The typical range of acceptable attorneys' fees in the Ninth Circuit is 20% to 33 1/3% of the total settlement value, with 25% considered the benchmark. *Powers v. Eichen*, 229 F.3d 1249, 1256 (9th Cir. 2000).  Because the fees to which the parties agreed are within the range awarded by the Ninth Circuit, the Court finds the Settlement does not provide a disproportionate distribution to Class Counsel.  *See Millan v. Casvade Water Servs.*, 310 F.R.D. 593, 612 (E.D. Cal. 2015).

> 2.      Existence of a "clear sailing" agreement

In general, a "clear sailing" provision is one in which the parties agree to the "payment of attorneys' fees separate and apart from class funds."  *In re Bluetooth Headset Prods. Liab. Litig*., 654 F.3d at 947.  However, the Ninth Circuit recognized a "clear sailing" arrangement exists also when a defendant expressly agrees not to oppose an award of attorneys' fees up to an agreed upon amount. *Lane*, 696 F.3d at 832; *In re Bluetooth Headset Prods.*, 654 F.3d at 947.

The Settlement Agreement indicates "Defendants will not oppose[] an application to the Court for attorney's fees in an amount equal to 33 1/3% of the Gross Settlement Amount…."  (Doc. 75-2 at 8, ¶ 23.)  Thus, the Settlement includes a version of a "clear sailing agreement."  Nevertheless, the existence of a clear sailing provision is not necessarily fatal to final approval.  *See In re Bluetooth Headset Prods. Liab. Litig*., 654 F.3d at 948; *see also In re Toys R Us-Delaware, Inc.–Fair and Accurate Credit Transactions Act (FACTA) Litig*., 295 F.R.D. 438, 458 (C.D. Cal. 2014) ("a clear sailing agreement is one where the party paying the fee agrees not to contest the amount to be awarded by the fee-setting court so long as the award falls beneath a negotiated ceiling").  Rather, "when

20

1  confronted with a clear sailing provision, the district court has a heightened duty to peer into the

2  provision and scrutinize closely the relationship between attorneys fees and benefit to the class." *Id*.

3  (citing *Staton*, 327 F.3d at 954).

4     As discussed below, the Court finds an award from the common fund is appropriate and the

5  fees to be awarded are reasonable in light of the work completed and results obtained.  This factor

6  does not mandate a finding of collusion and the factor does not weigh against final approval of the

7  settlement.  *See Singh v. Roadrunner Intermodal Servs. LLC*, 2019 WL 316814 at *7-8 (E.D. Cal. Jan

8  24, 2019) (not finding collusion between the parties, despite a clear sailing agreement, where the fee

9  award was analyzed and determined to be reasonable).

10        3.  Whether there is a reversion to Defendant

11     Finally, the parties did not arrange for any unawarded fees to revert to AT&T.  (Doc. 85 at 8.)

12  Instead, the parties acknowledge in the Settlement that fees shall be paid from the Gross Settlement

13  Amount, which is "non-reversionary." (Doc. 75-2 at 7-8, ¶¶ 22-23.)  Because any unawarded fees

14  return to the Settlement Amount for distribution to Class Members, this factor does not support a

15  finding of collusion.

16        4.  Findings on collusion

17     Based upon the factors set forth by the Ninth Circuit, the Court finds the Settlement "appears to

18  be the product of serious, informed, non-collusive negotiations."  *See In re Tableware Antitrust Litig.*,

19  484 F. Supp. 2d 1078, 1079-80 (N.D. Cal. 2007).  Thus, this factor under Rule 23 supports final

20  approval of the class settlement.

21    **C.**  **Relief provided to the Class**

22     The Ninth Circuit observed "the very essence of a settlement is compromise, 'a yielding of

23  absolutes and an abandoning of highest hopes.'"  *Officers for Justice v. Civil Serv. Commission*, 688

24  F.2d 615, 624 (9th Cir. 1982) (citation omitted).  When analyzing an agreement, the Court should

25  examine "the complete package taken as a whole," and the proposed settlement is "not to be judged

26  against a hypothetical or speculative measure of what *might* have been achieved by the negotiators."

27  *Officers for Justice*, 688 F.2d at 625, 628.

28     The proposed gross settlement fund is $575,000.00.  (Doc. 75-2 at 7-8, Settlement ¶ 22.)  After

21

the anticipated deductions from the gross amount, the Settlement Administrator estimates $331,039.23 will be dispersed to Participating Class Members.  (Doc. 85-1 at 6, Bridley Decl. ¶ 12, n.1.)  Analyzing the factors identified in Rule 23—as discussed below—the Court finds the amount offered and relief provided to the Settlement Class supports final approval of the Settlement.

### 1.    Costs, risks, and delays

A "central concern" in evaluating a proposed class settlement "relate[s] to the cost and risk involved in pursuing a litigated outcome."  *Feltz v. Cox Comm's Cal., LLC*, 2022 WL 2079144 at *9 (C.D. Cal. Mar. 2, 2022) (quoting Fed. R. Civ. P. 23(e), 2018 Advisory Committee Notes [modification in original].)  Approval of settlement is "preferable to lengthy and expensive litigation with uncertain results."  *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 529 (C.D. Cal. 2004).  If the Settlement were to be rejected, the parties would have to engage in further litigation, including seeking class certification and discovery on the issue of damages.

Previously, Razo reported this action "settled after substantial informal and formal discovery, which included applicable policies, collective bargaining agreements, and data pertaining to the Class." (Doc. 75 at 24.)  According to Razo, "Counsel also evaluated class data provided by Defendant showing class size, workdays, and pay periods, as well as electronic time for a representative sample of the class, which allowed for further vetting of the claims and preparation of an exposure analysis." (Doc. 85 at 16-17.)

Razo also acknowledged risks related to the meal and rest period claims, premium payments, and recovery under PAGA because AT&T denied his claims and "the bulk of liability" was released through *Wallack.*  (Doc. 75 at 25, 26.)  Razo notes AT&T implemented procedures that "minimize" violations and it is "unlikely that the Court would award maximum penalties" under PAGA.  (*Id.* at 27.) Razo asserts that he "faced risk that he may not prevail on a contested motion for class certification, particularly in light of the denial of certification in a case alleging similar claims, *Ayala et al. v. AT&T Mobility Services, LLC*, Case No. 2:18-cv-08809 (C.D. Cal.)."  (Doc. 85 at 19.)  Further, Razo contends he "faced considerable risk" related to his pay claims because "until July 15, 2021, the law was contrary to Plaintiff's position that meal and rest period premiums are to be paid at the employee's regular rate of compensation."  (*Id.*, citing *Ferra v. Loews Hollywood Hotel, LLC*, 40 Cal. App. 5th

1239 (Oct. 9, 2019), *rev'd*, 11 Cal. 5th 858 (July 15, 2021).)

With the proposed settlement, "Class Members will avoid the risks of litigation (including the possibility that class certification will be denied and no relief will be available to the class members) and receive in exchange for a release of claims a pro rata share of the Net Settlement Amount based on the total number of covered workweeks they worked." (Doc. 75 at 24, citing Settlement ¶ 26(a).) Further, the "Class Members will receive compensation for Defendant's alleged violations without further delay." (*Id.* at 25.) Razo contends that "[d]elay is a significant concern as the Class Members in this case are modest wage workers for whom receiving speedy remuneration is particularly important." (Doc. 85 at 20.)

As Razo observes, the time and expense of continued litigation related to these claims could outweigh any additional recovery. On the other hand, Settlement provides for immediate recovery on claims presented by Razo on behalf of the class. Due to the acknowledged risks to the claims of Class Members, costs of future litigation that may reduce the recovery to class members, and delay in payments if the agreement is not approved, this factor weighs in favor of final approval of the Settlement. *See Rodriguez*, 563 F.3d at 966 (risk, expense, complexity and duration of litigation supports settlement); *Curtis-Bauer v. Morgan Stanley & Co., Inc*., 2008 WL 4667090, at *4 (N.D. Cal. Oct. 22, 2008) ("Settlement avoids the complexity, delay, risk and expense of continuing with the litigation and will produce a prompt, certain, and substantial recovery for the Plaintiff class.").

### 2.    Proposed distribution

"[T]he goal of any distribution method is to get as much of the available damages remedy to class members as possible and in as simple and expedient a manner as possible." *Hilsley v. Ocean Spray Cranberries, Inc.*, 2020 WL 520616 at *7 (S.D. Cal. Jan. 31, 2020) (citing "Final approval criteria—Rule 23(e)(2)(C)(ii): Distribution method," 4 NEWBERG ON CLASS ACTIONS § 13:53 (5th ed.)). "Often it will be important for the court to scrutinize the method of claims processing to ensure that it facilitates filing legitimate claims." Fed. R. Civ. P. 23(e), 2018 Advisory Committee Notes. The proposed method for processing claims "should deter or defeat unjustified claims, but the court should be alert to whether the claims process is unduly demanding." *Id*.

Class Members are not required to take any action, such as submitting a claim form, to receive

1   a settlement share.  (*See* Doc. 85 at 9 ("Settlement Class Members who do not opt out of the

2   Settlement will <u>not</u> need to submit claims…" [emphasis in original].)  Rather, Class Members only

3   needed to take specific actions if they wished to opt-out, objected to any of the terms of the

4   Settlement, or disputed the amount of their individual share.  Because Class Members are not required

5   to submit a claim form, the proposed method of distribution will facilitate payment for legitimate

6   claims and is not "unduly demanding" upon Settlement Class members.  Thus, this factor weighs in

7   favor of final approval of the settlement. *See Jackson v. Fastenal Co.*, 2021 WL 5755583 at *11 (E.D.

8   Cal. Dec. 3, 2021) (finding "the proposed method of distributing relief is effective, and weighs in

9   favor of a finding that the settlement agreement is fair, reasonable and adequate" where the class

10   members did not have to file a claim).

11              3.      Attorneys' fees

12          When evaluating the terms of a settlement, "courts must scrutinize 'the terms of any proposed

13   award of attorney's fees.'" *McKinney-Drobnis v. Oreshack*, 16 F.14th 594, 607 (9th Cir. 2021)

14   (quoting Fed. R. Civ. P. 23(e)(2)(C)(iii)). The Ninth Circuit explained, "the new Rule 23(e) makes

15   clear that courts must balance the 'proposed award of attorney's fees' vis-à-vis the 'relief provided for

16   the class,' in determining whether the settlement is 'adequate' for class members." *Id.*, quoting

17   *Briseño*, 998 F.3d at 1024.

18          As discussed above, Class Counsel may request fees in the amount of one-third of the

19   settlement fund.  (Doc. 75-2 at 8, Settlement ¶ 23.)  The fees to which the parties agreed are within the

20   range of acceptable attorneys' fees in the Ninth Circuit.  *See Powers*, 229 F.3d at 1256.  This payment

21   shall be made "by wire to Bradley/Grombacher LLP from the Gross Settlement Amount." (*Id.*)  AT&T

22   will transfer the Gross Settlement Amount to the appointed Settlement Administrator within 35 days

23   of any order granting Final Approval of the Settlement, and the Settlement Administrator will transfer

24   the approved fees to Class Counsel within seven days.  (*Id.* at 19-20, ¶ 40.)  In that same seven-day

25   period, the Settlement Administrator will issue the other approved payments, including to Class

26   Members.  (*Id.*)  Thus, Class Counsel will receive payment at the same time as Class Members.

27   Accordingly, the amount of fees and the timing of the payment do not weigh against final approval of

28   the Settlement.

24

### 4.     Agreement required to be identified

The Court must consider any agreement that is required to be identified under Rule 23(e)(3). Fed. R. Civ. P. 23(e)(2)(C)(iv).  Specifically, "parties seeking approval must file a statement identifying any agreement made in connection with the proposal."  Fed. R. Civ. P. 23(e)(3).  The parties have identified no such agreement and the Court is not aware of any such agreement.  Therefore, this factor does not weigh against final approval.

### D.     Treatment of Class Members

Rule 23 requires the Court to consider whether the proposed settlement "treats class members equitably relative to each other."  Fed. R. Civ. P. 23(e)(2)(D).  "A distribution of relief that favors some class members at the expense of others may be a red flag that class counsel have sold out some of the class members at the expense of others, or for their own benefit."  *Hilsley*, 2020 WL 520616 at *7 (citation omitted).

The parties agreed that "[e]ach Class Member who does not timely opt-out of the settlement will receive a *pro rata* share of the Net Settlement Amount based on the number of weeks that he or she worked in each position covered by the Settlement from November 2, 2021, to the date of preliminary approval (the 'Class Member Payment')."  (Doc. 75-2 at 9, Settlement ¶ 26.)  The Class Member Payment will also include any "Aggrieved Employee Payment" under Cal. Lab. Code § 2699(c).  *Id.*

Because the Settlement provides *pro rata* distribution to Class Members based upon the number of workweeks, the agreement treats the Class Members equitably, and the proposed distribution plan supports final approval.  *See Cooks v. TNG GP*, 2021 WL 5139613 at *4 (E.D. Cal. Nov. 4, 2021) (observing the calculation of payments to class members "on a pro-rata basis based on the number of compensable workweeks each member worked … is fair and treats class members equitably"); *see also Gomez-Gasca v. Future AG Mgmt. Inc.*, 2020 WL 6149688 at *4 (N.D. Cal. Oct. 20, 2020) (approving an agreement including "pro rata allocation based on the number of workweeks the class member performed work during the Class Period"); *In re Regulus Therapeutics Sec. Litig.*, 2020 WL 6381898 at *5 (S.D. Cal. Oct. 29, 2020) (finding a *pro rata* distribution plan was equitable and weighed in favor of approving the settlement terms).

E.      **Views of Counsel**

AT&T indicates in the Settlement that it "agree[s] the Settlement is fair, adequate and reasonable." (Doc. 75-2 at 7, ¶ 21.)  In addition, Class Counsel agree "the settlement is fair, reasonable, adequate, and in the best interest of the Class given the risks and costs of continued litigation supports its receiving final approval." (Doc. 85 at 17.)  These opinions of counsel are entitled to significant weight and support final approval of the Settlement.  *See Nat'l Rural Telecomms.*, 221 F.R.D. at 528 ("Great weight is accorded to the recommendation of counsel, who are most closely acquainted with the facts of the underlying litigation"); *Barbosa v. Cargill Meat Solutions Corp.*, 297 F.R.D. 431, 447 (E.D. Cal. 2013) ("the trial court is entitled to, and should, rely upon the judgment of experienced counsel for the parties").

F.      **Reaction of Class Members to the Settlement**

"[T]he absence of a large number of objections to a proposed class action settlement raises a strong presumption that the terms of a proposed class action settlement are favorable to the class members." *Nat'l Rural Telecomms.*, 221 F.R.D. at 529; *see also Cottle*, 340 F.R.D. at 376 (observing the court may assess the reaction of class members by considering "how many class members submitted … objections" at the final approval stage).

Razo agreed to the terms of Settlement and executed the agreement. (Doc. 75-2 at 26.)  No class members objected to the Settlement, and only six people requested exclusion from the Class, out of more than 5,000.  (Doc. 85 at 17; *see also* Doc. 86 at 2, Bridley Supp Decl. ¶ 5.)  Thus, a significant majority of Class Members reacted favorably to the proposed settlement terms by not requesting exclusion or submitting objections, and this factor weighs in favor of final approval.  *See Chun-Hoon v. McKee Foods Corp.*, 716 F. Supp. 2d 848, 852 (N.D. Cal. 2010) (finding the class members' reaction was "overwhelming[ly] positive" where 16 out of 329 individuals—a total of approximately 4.86% of the class— opted out of the settlement).

III.     **Conclusion**

The factors identified under Rule 23 and by the Ninth Circuit weigh in favor of final approval of the Settlement, and the terms of the Settlement are fair, reasonable, and adequate.  Therefore, the request for final approval of the Settlement Agreement is **GRANTED**.

## APPROVAL OF PAGA SETTLEMENT

California adopted the Private Attorney General Act to allow individual plaintiffs "to bring a civil action to collect civil penalties for Labor Code violations previously only available in enforcement actions initiated by the State's labor law enforcement agencies." *Caliber Bodyworks, Inc. v. Superior Court*, 134 Cal. App. 4th 365, 374 (2005); Cal. Lab. Code § 2699(a); *Urbino v. Orkin Servs. of Cal., Inc.*, 726 F.3d 1118, 1121 (9th Cir. 2013). Thus, a PAGA plaintiff now acts "as the proxy or agent of the state's labor law enforcement agencies." *Arias v. Superior Court*, 46 Cal. 4th 969, 986 (2009).

Pursuant to PAGA, an "aggrieved employee" may bring an action for civil penalties for labor code violations on behalf of himself and other current or former employees. Cal. Lab. Code § 2699(a). PAGA defines an "aggrieved employee" as "any person who was employed by the alleged violator and against whom one or more of the alleged violations was committed." *Id*. A judgment in a PAGA action "binds all those, including nonparty aggrieved employees, who would be bound by a judgment in an action brought by the government." *Arias*, 46 Cal. 4th at 986.

To bring an action under PAGA, an aggrieved employee must first provide written notice to the employer and the Labor and Work Force Development Agency. Cal. Lab. Code § 2699.3(a)(1). Recovery under PAGA is limited to civil penalties, and the civil penalties must be allocated with 75% directed to the LWDA and 25% to aggrieved employees. *Id.* § 2699(i). Any proposed settlement of PAGA claims must be submitted to the LWDA, and a trial court must "review and approve" any settlement of PAGA claims. *Id.* § 2699(l)(2); *see also Haralson v. U.S. Aviation Servs. Corp.*, 383 F. Supp. 3d 959, 971 (N.D. Cal. 2019) (because settling a PAGA claim "compromises a claim that could otherwise be brought be the state," it requires that a court "review and approve any settlement of any civil action pursuant to [PAGA]") (citation omitted).

Although there is no binding authority establishing the standard of review for PAGA settlements, California district courts "have applied a Rule 23-like standard, asking whether the settlement of the PAGA claims is 'fundamentally fair, adequate, and reasonable in light of PAGA's policies and purposes.'" *Haralson*, 383 F. Supp. 3d at 972. This standard is derived principally from the LWDA itself. *See O'Connor v. Uber Techs., Inc.*, 201 F. Supp. 3d 1110, 1133 (N.D. Cal. 2016). The LWDA indicated:

1
2
3
4

> It is thus important that when a PAGA claim is settled, the relief provided
> for under the PAGA be genuine and meaningful, consistent with the
> underlying purpose of the statute to benefit the public and, in the context
> of a class action, the court evaluate whether the settlement meets the
> standards of being "fundamentally fair, reasonable, and adequate" with
> reference to the public policies underlying the PAGA.

5  *Id.* (citation omitted).  When a proposed settlement involves overlapping class action and PAGA

6  claims, courts may employ a "sliding scale" in determining if the proposed settlement is

7  "fundamentally fair, reasonable, and adequate with reference to the public policies underlying the

8  PAGA." *O'Connor*, 201 F. Supp. 3d at 1134; *see also Haralson*, 383 F. Supp. 3d at 972 (following

9  *O'Connor*); *Cooks v. TNG GP*, 2020 WL 5535397 at *9-10 (E.D. Cal. Sept. 15, 2020) (same).

10  "[W]here the settlement for the rule 23 class is robust, the purposes of PAGA may be concurrently

11  fulfilled."  *Cooks*, 2020 WL 5535397 at *10 (quoting *O'Connor*, 201 F. Supp. 3d at 1134).

12  Class Counsel reported they submitted the revised class and PAGA settlement to the LWDA as

13  required by the Labor Code of May 26, 2022.  (Doc. 75 at 28, Grombacher Decl. ¶ 54.)  Notably, all

14  participating members of the Settlement Class are also Aggrieved Employees.  (Doc. 85-1 at 5,  ¶ 14.)

15  The settlement of $575,000.00 appears sufficiently robust—with more than $330,000 going to Class

16  Members—such that the Court finds the purposes of PAGA to address the alleged labor violations are

17  fulfilled by the proposed agreement.  The Settlement properly designates 75% of the PAGA funds—in

18  the amount of $10,000 from the Gross Settlement Amount— to the LWDA and 25% to aggrieved

19  employees.  (Doc. 75-2 at 4, Settlement ¶ 6.)  Accordingly, the Court finds approval of the PAGA

20  payment is also appropriate.  *See Jamil v. Workforce Resources*, 2020 WL 6544660 at *6 (S.D. Cal.

21  Nov. 5, 2020) (finding a $10,000 PAGA award was fair and adequate as part of a class settlement).

22  ## REQUEST FOR ATTORNEYS' FEES

23  Pursuant to the Settlement, Class Counsel may seek attorney's fees in the amount of 33 1/3 %

24  of the Gross Settlement Amount, or $191,666.67.  (Doc. 75-2 at 8, Settlement ¶ 23.)  Class Counsel

25  now seeks fees in this amount, asserting "the requested award is fair, reasonable, and appropriate in

26  light of the favorable results obtained by Plaintiff's Counsel, the complexities of the litigation, the

27  contingent risk, and the lodestar incurred."  (Doc. 84 at 8.)  AT&T does not oppose the fee request.

28  (*See* Doc. 75-2 at 8, ¶ 23).

## I.      Legal Standards

"[A] district court must carefully assess the reasonableness of a fee amount spelled out in a class action settlement agreement." *Staton v. Boeing Co.*, 327 F.3d 938, 963 (9th Cir. 2003).  Thus, a court "may not uncritically accept a fee request," but must review the time billed and assess whether it is reasonable in light of the work performed and the context of the case.  *Common Cause v. Jones*, 235 F. Supp. 2d 1076, 1079 (C.D. Cal. 2002); *see also McGrath v. County of Nevada*, 67 F.3d 248, 254 n.5 (9th Cir. 1995) (noting a court may not adopt representations regarding the reasonableness of time expended without independently reviewing the record); *Sealy, Inc. v. Easy Living, Inc.*, 743 F.2d 1378, 1385 (9th Cir. 1984) (remanding an action for a thorough inquiry on the fee request where "the district court engaged in the 'regrettable practice' of adopting the findings drafted by the prevailing party wholesale" and explaining a court should not "accept[] uncritically [the] representations concerning the time expended").

Class Counsel assert the reasonableness of the fee request should be evaluated under California law, because the Court has diversity jurisdiction over this action.  (Doc. 84 at 15, citing *Mangold v. Calif. Public Utilities Comm'n*, 67 F.3d 1470, 1478 (9th Cir. 1995) (noting the Ninth Circuit applied state law "in the method of calculating the fees"); *Vizcaino v. Microsoft Corp*., 290 F.3d 1043, 1047 (9th Circ. 2002) (holding state law governing underlying claims in a diversity action "also governs the award of fees")).  However, Class Counsel contend the fee request is also reasonable under Ninth Circuit precedent.  (*Id.* at 17-20.)  Notably, as discussed below, both state and federal courts consider similar tests to evaluate the reasonableness of the fees requested from a settlement fund.

The Court has discretion to use either a lodestar or percentage calculation to evaluate a fee request.  *See Paul, Johnson, Alston & Hunt v. Graulty*, 886 F.2d 268, 272 (9th Cir. 1989); *see also Lafitte v. Robert Half Int'l Inc.,* 1 Cal.5th 480, 504 (2016) ("The choice of a fee calculation method is generally one within the discretion of the trial court, the goal under either the percentage or lodestar approach being the award of a reasonable fee to compensate counsel for their efforts.").  Whether the Court applies the lodestar or percentage method, the fees awarded must comply with Rule 23 and be "fundamentally fair, adequate, and reasonable."  *Staton*, 327 F.3d at 963 (quoting Fed.R.Civ.P. 23(e)). ///

**A.      Lodestar method**

The lodestar method calculates attorney fees by "by multiplying the number of hours reasonably expended by counsel on the particular matter times a reasonable hourly rate." *Florida*, 915 F.2d at 545 n. 3 (citing *Hensley*, 461 U.S. at 433); *see also Lafitte*, 1 Cal. 5th at 489.  The product of this computation, the "lodestar" amount, yields a presumptively reasonable fee. *Gonzalez v. City of Maywood*, 729 F.3d 1196, 1202 (9th Cir. 2013); *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 978 (9th Cir. 2008).  Next, the Court may adjust the lodestar upward or downward using a "multiplier" considering factors adopted by the Ninth Circuit:

> (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.[4]

*Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975).  Likewise, under California law, "[o]nce the court has fixed the lodestar, it may increase or decrease that amount by applying a positive or negative multiplier to take into account a variety of other factors, including the quality of the representation, the novelty and complexity of the issues, the results obtained, and the contingent risk presented." *Laffitte*, 1 Cal.5th at 489 (internal quotation marks omitted).

**B.      Percentage from the common fund**

As the name suggests, under this method, "the court makes a fee award on the basis of some percentage of the common fund." *Florida*, 915 F.2d at 545 n. 3.  "The typical range of acceptable attorneys' fees in the Ninth Circuit is 20% to 33 1/3% of the total settlement value, with 25% considered the benchmark." *Vasquez v. Coast Valley Roofing*, 266 F.R.D. 482, 491 (E.D. Cal. 2010); *see also Powers*, 299 F.3d at 1256 (noting the Ninth Circuit "established twenty-five percent of the recovery as a 'benchmark' for attorneys' fees calculations under the percentage-of-recovery approach").  California has recognized that fee awards "average around one-third of the recovery," but

---

[4] The Ninth Circuit has since determined the nature of a fee and the "desirability" of a case are no longer relevant factors. *Resurrection Bay Conservation Alliance v. City of Seward*, 640 F.3d 1087, 1095, n.5 (9th Cir. 2011) (citation omitted).

also endorsed the federal benchmark.  *See Chavez v. Netflix, Inc.,* 162 Cal.App.4th 43, 66 n.11 (2008); *see also In re Consumer Privacy Cases*, 175 Cal.App.4th 545, 557 n. 13 (2009) ("25 percent is the benchmark award that should be given in common fund cases").

To evaluate whether the requested percentage is reasonable, courts may consider a number of factors, including: (1) the results obtained for the class; (2) the risk undertaken by class counsel, including the complexity of the issues; (3) the length of the professional relationship between class counsel and the plaintiffs; and (5) the market rate, with a lodestar cross-check.  *Vizcaino v. Microsoft Corp.,* 290 F.3d 1043, 1048-1050 (9th Cir. 2002); *Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990); *see also Lafitte*, 1 Cal. 5th at 504 (determining the reasonableness of percentage fee through considering "the risks and potential value of the litigation;" the "contingency, novelty and difficulty" of the case; and "the skill shown by counsel, the number of hours worked, and the asserted hourly rates").

The percentage of the common fund awarded as fees may be adjusted below or above the benchmark, but the Court's reasons for adjustment must be clear.  *Graulty*, 886 F.2d at 272; *see also In re Bluetooth Headset Prod. Liab. Litig.,* 654 F.3d 935, 942 (9th Cir. 2011) ("courts typically calculate 25% of the fund as the 'benchmark' for a reasonable fee award, providing adequate explanation in the record of any 'special circumstances' justifying a departure").

### C.      Fee applicant's burden

Notably, the Court must consider similar factors under both the lodestar method and awarding a percentage of the common fund.  *See Kerr*, 526 F.2d at 70; *Vizcaino*, 290 F.3d at 1048-1050.  With either method, the fee applicant bears the burden of establishing that the fees and costs were reasonably necessary to achieve the results obtained.  *See Fischer v. SJB-P.D., Inc.*, 214 F.3d 1115, 1119 (9th 2000).  Therefore, a fee applicant must provide records documenting the tasks completed and the amount of time spent.  *Hensley v. Eckerhart*, 461 U.S. 424, 424 (1983); *Welch v. Metropolitan Life Ins. Co.*, 480 F.3d 942, 945-46 (9th Cir. 2007).  "Where the documentation of hours in inadequate, the district court may reduce hours accordingly."  *Hensley*, 461 U.S. at 433.

### II.      Evaluation of the Fees Requested

As noted above, Class Counsel request the Court determine the reasonableness of the fee award

by using the percentage of the common fund, and award 33 1/3% of the Gross Settlement Amount. (Doc. 84 at 16.)  Under the "common fund" doctrine, attorneys who create a common fund for a class may be awarded fees from that fund.  *Hanlon*, 150 F.3d at 1029; *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980) ("a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole").  An award from the common fund "rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense," and application of the doctrine is appropriate "when each member of a certified class has an undisputed and mathematically ascertainable claim to part of a lump-sum judgment recovered on his behalf."  *Boeing Co.*, 444 U.S. at 478.  Because the Settlement applies a pro rata distribution formula to determine the amount paid to each class member (*see* Doc. 75-2 at 9, ¶ 26), application of the common fund doctrine is appropriate.

Significantly, when fees are to be paid from a common fund, as here, the relationship between the class members and counsel "turns adversarial."  *In re Washington Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1302 (9th Cir. 1994).  The Ninth Circuit observed:

> [A]t the fee-setting stage, plaintiff's counsel, otherwise a fiduciary for the class, has become a claimant against the fund created for the benefit of the class.  It is obligatory, therefore, for the trial judge to act with a jealous regard to the rights of those who are interested in the fund in determining what a proper fee award is.

*Id.* at 1302 (internal quotation marks, citation omitted).  As a result, the district court must assume a fiduciary role for the class members in evaluating the reasonableness of a request for fees from the common fund.  *Id.*; *Rodriguez v. W. Publ'g Corp.*, 563 F.3d 948, 968 (9th Cir. 2009) ("when fees are to come out of the settlement fund, the district court has a fiduciary role for the class").

### A.      Time and labor required

Class Counsel report they worked 551.0 hours on work related to this action, including 3.0 hours by Marcus Bradley, 78.5 hours by Kiley Grombacher, 63.1 hours by Lirit King, and 406.4 hours Leslie Joyner.  (Doc. 84-1 at 16; *see also id.* at 23-38.)  Class Counsel note this total does not include "billing entries for paralegals/law clerks who contributed to the case and for individuals who billed less than 10 hours of work on the case." (*Id.* at 16, ¶ 59, emphasis omitted.)  Class Counsel also assert they "had to forego requests by other prospective clients to bring other cases with merit to ensure that

they could continue to adequately and successfully represent the Plaintiff and the class in this matter."
(Doc. 84 at 22, citing Grombacher Decl. ¶ 62 [Doc. 84-1 at 17].)  According to Class Counsel, "there
were other meritorious cases presented to Plaintiff's Counsel that would have generated substantial
fees, but were declined, during the pendency of this action in order to devote the attention necessary to
achieve the highly favorable results in the Settlement."  (*Id.*)  Based upon the time expended and
information provided by Ms. Grombacher, the Court finds this factor supports an award of the fees
requested by Class Counsel.

### B.   Results obtained for the class

Courts have recognized the result achieved for the class is a major factor to be considered in
making a fee award.  *Hensley*, 461 U.S. at 436; *Wilcox v. City of Reno*, 42 F.3d 550, 554 (9th Cir.
1994); *see also Lealao v. Beneficial California, Inc.*, 82 Cal.App.4th 19, 45 (2000) (observing
"California courts often use ... the result obtained by counsel" as a relevant factor in evaluating fees,
including enhancing a lodestar).  The Ninth Circuit observed that "[e]xceptional results are a relevant
circumstance" to an adjustment from the benchmark award.  *Vizcaino*, 290 F.3d at 1048.

Class Counsel assert "the final settlement figure of $575,000.00 represents an excellent result
for the Class."  (Doc. 84 at 20.)  According to Class Counsel, this "provides for compensation to the
absent class members in an amount equal to full value for the *Ferra* claims, the primary claims alleged
in this case, and provides significant recovery for the remaining alleged violations."  (*Id.* at 21.)
Further, after the anticipated deductions, the amount to be distributed to Class Members totals
$331,539.23, and Class Members will receive an average payment of $65.90.[5]  (*Id.* at 20; Doc. 85-1 at
5, Bridley Decl. ¶¶ 13-14.)  Class Counsel assert the estimated average payment of $65.90 "is
particularly strong in light of the narrow release and short liability period of just over 10 months."  (*Id.*
at 20-21.)  Class Counsel contend this "compares very favorably with other settlements of analogous
wage and hour class actions."  (*Id.* at 21.)  For example, Class Counsel observe that the *Wallack* case—
which included "a broader release" than those of Class Members here—"settled for $4,040,000 for over
12,600 class members and a liability period of more than 6 years (from August 1, 2015 through

---

[5] Class Members are expected to receive an average payment of $65.47.  (Doc. 85-1 at 5, Bridley Decl. ¶ 13.)  When the anticipated payments under PAGA are included, the average payment increases to $65.90. (*Id.*, Bridley Decl. ¶ 14.)

1 November 1, 2021) amounting in an average individual recovery of approximately $192.60." (*Id.*,

2 citing Grombacher Decl. ¶ 72 [Doc. 84-1 at 19].)

3       Notably, the average payment here is approximately one-third of the average payment in

4 *Wallack*, though the liability period in *Wallack* covered more than six years (from August 1, 2015 to

5 November 1, 2021) and the liability period in the matter now before the Court is less than one year

6 (from November 2, 2021 to September 21, 2022) for Class Members.[6]  Given the results achieved by

7 Class Counsel, including recovery of the full value for the *Ferra* claims, this factor supports an award

8 of the fees requested.

9     **C.**     **Risk undertaken by counsel**

10       The risk of costly litigation and trial is an important factor in determining the fee award.

11 *Chemical Bank v. City of Seattle*, 19 F.3d 1297, 1299-1301 (9th Cir. 1994).  The Supreme Court

12 explained, "the risk of loss in a particular case is a product of two factors: (1) the legal and factual

13 merits of the claim, and (2) the difficulty of establishing those merits."  *City of Burlington v. Dague*,

14 505 U.S. 557, 562 (1992).

15       Class Counsel asserts the risks undertaken "justify the fees requested." (Doc. 84 at 21, emphasis

16 omitted.)  According to Class Counsel, Razo "faced risk that he may not prevail on a contested motion

17 for class certification," noting that certification of a class was denied in *Ayala et al. v. AT&T Mobility*

18 *Services, LLC*, Case No. 2:18-cv-08809 (C.D. Cal.), which addressed "similar claims."  (*Id.* at 23.)  In

19 addition, Class Counsel observe there was a risk to the merits of Razo's claims based upon *Ferra*[7]

20 "during a substantial portion of the time this case was pending."  (*Id.*)  Class Counsel explain:

21         [U]ntil July 15, 2021, the law was contrary to Plaintiff's position that meal
        and rest period premiums must be paid at the employee's regular rate of

22         compensation. *See Ferra v. Loews Hollywood Hotel, LLC*, 40 Cal. App. 5th
        1239 (Oct. 9, 2019), *rev'd*, 11 Cal. 5th 858 (July 15, 2021).  Further, even

23         after the Supreme Court affirmed in *Ferra* that employers must pay meal
        and rest period at the employee's regular rate of pay, there still would be

24         uncertainty in terms of the damages that would be proved and collected.

25

26 _____

27 [6] The Court notes  the Settlement Class also includes individuals who opted out of *Wallack*.  (Doc. Doc. 75-2 at 3, ¶ 2.)
For such Class Members, the liability period may be greater than eleven months.

28 [7] Razo asserted Defendant had a common practice and policy of improperly playing meal and rest premiums at their base
hourly rates, rather than their regular rates, thereby invoking liability under *Ferra v. Loews Hollywood Hotel, LLC*, 11 Cal.
5th 858 (2021). (*See* Doc.34 at 18.)

(*Id.*)  Further, Class Counsel contend "[t]he risks associated with the contingent nature of this action justify the requested fees."  (*Id.* at 22, citing *Fischel v. Equitable Life Assurance Soc'y of U.S.*, 307 F.3d 997, 1008 (9th Cir. 2002).)

The Ninth Circuit has suggested the distinction between a contingency arrangement and a fixed fee arrangement alone does not merit an enhancement from the benchmark.  *See In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 942 n.7. (9th Cir. 2011) ("whether the fee was fixed or contingent" is "no longer valid" as a factor in evaluating reasonable fees) (citation omitted); *but see In re Online DVD-Rental Antitrust Litigation*, 779 F.3d 934, 954-55 (9th Cir. 2015) (finding the contingent nature of litigation remains a relevant factor to evaluate a request from the common fund). Nevertheless, Class Counsel have also identified risks to the legal merits of Razo's claims based upon the calculation of meal and rest period premium.  This action was filed on August 27, 2019, at which time the law was contrary to Razo's position concerning the calculation of pay.  The matter was pending for nearly two years before the California Supreme Court held in *Ferra* that premiums must be calculated based upon an employee's regular rate of pay.  Thus, Class Counsel bore significant risks with the legal merits with the action—and that liability may not be established— and this factor supports the request for an upward departure from the benchmark.

### D.   Complexity of issues and skill required

The complexity of issues and skills required may support a departure from the benchmark fee award.  *See In re Pac. Enters. Sec. Litig.*, 47 F.3d 373, 379 (9th Cir. 1995) (finding no abuse of discretion in awarding attorney's fees that totaled 33% settlement fund, finding a departure from the benchmark was warranted "because of the complexity of the issues and the risks"); *see also Ross v. Bar None Enters.*, 2015 WL 1046117, at *9 (E.D. Cal. Mar. 10, 2015) ("Courts have recognized that the novelty, difficulty and complexity of the issues involved are significant factors in determining a fee award" [citation omitted]).

Class Counsel contend "[t]he difficulty of the questions involved, the vigorous opposition by Defendant, and the skill required justify the fee requested."  (Doc. 84 at 24, emphasis omitted.)  Class Counsel observe that "during the course of this action the law underlying Plaintiff's claims was continually evolving."  (*Id.*)  In addition, Class Counsel note they "presented and briefed a number of

novel issues such as whether the appointment of interim class counsel is appropriate to protect the class in instances where competing or overlapping cases are not consolidated before a single court and whether Defendant's attempt to compromise the *Ferra* claims for less than full value in the *Wallack* action ran afoul of Labor Code Section 206.5. (*Id.* at 24-25, citing Docs. 24, 33, 54, 60.)

Further, Class Counsel contend they were required to use their experience and skill in the matter due to "Defendant's vigorous defense," including "stiff resistance to class discovery." (Doc. 84 at 25.) Class Counsel report they were required to negotiate "with highly sophisticated Defense Counsel" and bring "a discovery dispute to the Court in order to obtain crucial information supporting the claims." (*Id.*) Class Counsel report during the discovery dispute that AT&T "disclosed for the first time the existence of a fast-tracked settlement and subsequent filing of the Wallack state court action designed with an extensive liability period for the purpose of settling out the class claims being prosecuted in this case." (*Id.*) Class Counsel also note their motion to compel discovery was granted by the Court. (*Id.*)

As Class Counsel asserts, they faced complex issues during the course of this litigation and representing Razo, particularly with seeking appointment as interim class counsel "to safeguard important substantive rights of the absent class members" and moving to intervene in *Wallack*. Moreover, Class Counsel faced significant uncertainty with the claims presented on behalf of Razo while waiting for the California Supreme Court to issue a decision in *Ferra* and addressing the claims raised and released in *Wallack*. The Court finds Class Counsel displayed skills consistent of those that would be expected of attorneys of comparable experience, successfully addressed the issues raised. *See Huynh v. Quora, Inc.* 2019 WL 11502874, at *1 (N.D. Cal. Apr. 11, 2019) (observing that "[t]he appointment of interim class counsel… is particularly suited to complex actions"). Therefore, this factor supports the requested fee award.

### E.   Length of the professional relationship

Class Counsel initiated this action on behalf of Razo in 2019, and it appears the professional relationship has lasted approximately four years. The short duration of the professional relationship may warrant an award below the benchmark. *See Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990) (finding "the 25 percent standard award" was appropriate although "the litigation lasted more than 13 years").

F. **Lodestar crosscheck and market rate**

As noted above, the Court may perform a lodestar cross-check to assist in the determination of whether the fees sought from a common fund are reasonable. *See Indirect Purchaser Class v. Erwin (In re Optical Disk Drive Prods. Antitrust Litig.)*, 959 F.3d 922, 933 (9th Cir. 2020) ("we have encouraged courts using the percentage-of-recovery method to perform a cross-check by applying the lodestar method to confirm that the percentage-of-recovery amount is reasonable"); *Lafitte*, 1 Cal. 5th at 504 ("A lodestar cross-check … provides a mechanism for bringing an objective measure of the work performed into the calculation of a reasonable attorney fee."). The lodestar is calculated by multiplying the time "reasonably expended" by counsel on the by "a reasonable hourly rate." *Florida*, 915 F.2d at 545 n. 3 (citing *Hensley*, 461 U.S. at 433); *see also Lafitte*, 1 Cal. 5th at 489.

1. Time expended

In general, the first step in determining the lodestar is to determine whether the number of hours expended was reasonable. *Fischer*, 214 F.3d at 1119; *Lafitte*, 1 Cal. 5th at 489. When the lodestar is used as a cross-check for a fee award, the Court is not required to perform an "exhaustive cataloguing and review of counsel's hours." *See Barbosa v. Cargill Meat Sols. Corp.,* 297 F.R.D. 431, 451 (E.D. Cal. 2013) (citation omitted). However, the Court has the discretion to review submitted time sheets to determine whether the time expended was reasonable. *See In re Washington Public Power Supply System Securities Litigation,* 19 F.3d 1291, 1298 (9th Cir.1994) (concluding the district court acted within its discretion in reducing the lodestar for unnecessary and duplicative work); *see also Lafitte*, 1 Cal. 5th at 505 ("trial courts retain the discretion to consider detailed time sheets as part of a lodestar calculation, even when performed as a cross-check on a percentage calculation").

The Court has reviewed the billing records provided by Class Counsel. The reported 540.5 hours[8] included tasks such as preparation of the pleadings, opposing a motion to dismiss, discovery, seeking appointment as interim class counsel, seeking to intervene in the *Wallack*, communications regarding settlement, a motion to compel that resulted in sanctions against AT&T, and preparation of the motions for approval of the Settlement. (*See* Doc. 84-1 at 23-38.) The Court's review of the time

---

[8] Class Counsel deducted 10.5 hours from their total hours to reflect the monetary sanctions previously awarded to Class Counsel against Defendant. (Doc. 84 at 28, n. 6; *see also* Doc. 61 [order awarding sanctions].)

1    sheets confirms that Class Counsel did not include unnecessary tasks, duplicative work, or clerical tasks

2    in the reported hours.  Thus, the Court finds the time expended on the matter was reasonable.

3                    2.      Hourly rates

4            Next, the Court must determine whether the hourly rates are reasonable to calculate the lodestar.

5    *See Florida*, 915 F.2d at 545 n.3; *see also Lafitte*, 1 Cal. 5th at 489.  The Supreme Court explained

6    attorney fees are to be calculated with "the prevailing market rates in the relevant community."  *Blum v.*

7    *Stenson*, 465 U.S. 886, 895-96 and n.11 (1984).  In general, the "relevant community" for purposes of

8    determining the prevailing market rate is the "forum in which the district court sits."  *Camacho v.*

9    *Bridgeport Fin., Inc.*, 523 F.3d 973, 979 (9th Cir. 2008).  Thus, when a case is filed in the Eastern

10   District of California, this District "is the appropriate forum to establish the lodestar hourly rate…" *See*

11   *Jadwin v. County of Kern*, 767 F.Supp.2d 1069, 1129 (E.D. Cal. 2011).

12           The fee applicant bears a burden to establish that the requested rates are commensurate "with

13   those prevailing in the community for similar services by lawyers of reasonably comparable skill,

14   experience, and reputation."  *Blum*, 465 U.S. at 895 n.11.  The applicant meets this burden by

15   producing "satisfactory evidence—in addition to the attorney's own affidavits—that the requested

16   rates are in line with those prevailing in the community for similar services by lawyers of reasonably

17   comparable skill, experience and reputation."  *Id.*; *see also Chaudhry v. City of Los Angeles*, 751 F.3d

18   1096, 1110-11 (9th Cir. 2014) ("Affidavits of the plaintiffs' attorney[s] and other attorneys regarding

19   prevailing fees in the community … are satisfactory evidence of the prevailing market rate.").  Here,

20   Class Counsel acknowledge their hourly rates are significantly higher than those typically approved in

21   the Eastern District, and counsel have adjusted their rates to calculate the lodestar.  (Doc. 84 at 28-29.)

22           Class Counsel seek $550 per hour for Marcus Bradley, $400 per hour for Kiley Grombacher,

23   and $385 per hour for associates Lirit King and Leslie Joyner. (Doc. 84-1 at 16.)  As Class Counsel

24   note, this Court previously indicated that "courts in the Eastern District of California Fresno Division

25   have approved hourly rates ranging from $200.00 to $550.00 per hour."  (Doc. 84 at 29, quoting

26   *Salgado v. T-Mobile USA, Inc*., 2020 WL 3127931, at *20 (E.D. Cal. June 12, 2020).)  In general, "the

27   highest rates generally reserved for those attorneys who are regarded as competent and reputable and

28   who possess in excess of 20 years of experience." *Silvester v. Harris*, 2014 WL 7239371 at *4 (E.D.

38

Cal. Dec. 17, 2014).  Based upon the prior survey of the attorney fees in the Eastern District and the Court's own knowledge—and in recognition that these rates were reduced from those previously awarded to Class Counsel in this action— the requested hourly rates are reasonable based upon the experience and reputation of counsel.  *See Silvester*, 2014 WL 7239371 at \*4; *see also Ingram v. Oroudjian*, 647 F.3d 925, 928 (9th Cir. 2011) ("the district court did not abuse its discretion either by relying, in part, on its own knowledge and experience" to determine reasonable hourly rates).

<u>3.</u>    <u>Calculation and cross-check</u>

With the adjusted hourly rates for counsel, the lodestar for Class Counsel totals $213,807.50:

| COUNSEL | HOURS | RATE | LODESTAR |
|---|---|---|---|
| Marcus Bradly | 3.0 | $550 | $1,650.00 |
| Kiley Grombacher | 78.5 | $400 | $31,400.00 |
| Lirit King | 63.1 | $385 | $24,293.50 |
| Leslie Joyner | 406.4 | $385 | $156,464.00 |
|  |  |  | $213,807.50 |

(Doc. 84-1 at 16, Grombacher Decl. ¶ 59.)  However, Class Counsel was previously awarded $8,280 in sanctions against AT&T and deducted the payment from the calculation, which reduces the lodestar total to $205,527.50.  (*Id.*)  Even with the downward adjustments, the lodestar exceeds the amount of fees now requested.  Consequently, the lodestar cross-check supports a conclusion that the fees requested are reasonable.  *See Gonzalez*, 729 F.3d at 1202; *Lafitte*, 1 Cal. 5th at 489.

**III.    Conclusion**

As set forth above, the Court finds the time and labor, results obtained, risks undertaken by skilled Class Counsel, and complexity of the issues weigh in favor of the fees requested.  In addition, the lodestar—which is a presumptively reasonable amount—supports the requested upward departure from the benchmark.  The fees requested are fair, adequate, and reasonable as required under Rule 23.  Accordingly, Class Counsels' request for fees is **GRANTED** in the amount of $**191,666.67**.

**REQUESTS FOR COSTS**

**I.    Litigation Costs**

In general, reimbursement of taxable costs is governed by 28 U.S.C. § 1920 and Federal Rule of Civil Procedure 54.  Attorneys may recover reasonable expenses that would typically be billed to

1  paying clients in non-contingency matters.  *See Harris v. Marhoefer*, 24 F.3d 16, 19 (9th Cir. 1994).

2  Previously, this Court found costs "including filing fees, mediator fees …, ground transportation, copy

3  charges, computer research, and database expert fees … are routinely reimbursed" in class action

4  cases.  *Alvarado v. Nederend*, 2011 WL 1883188 at *10 (E.D. Cal. Jan. May 17, 2011).

5  　　　　Previously, the Court authorized Class Counsel to seek "costs up to $10,000."  (Doc. 80 at 29.)

6  Class Counsel now request $4,747.58 in costs.  (Doc. 84 at 30.)  Costs incurred include: "(1) filing

7  fees, court fees, and service of process; (2) overnight and bulk mail; (3) appearance fees in the

8  Wallack action and (4) copies and postage."  (Doc. 84 at 30, citing Grombacher Decl. ¶ 77 [Doc. 84-1

9  at 20].)  Class Counsel report they "are not seeking recovery for a number of significant additional

10  costs they incurred in prosecuting this case, such as Westlaw legal research fees, [and] fees associated

11  with appealing the denial on the motion to intervene in *Wallack*…".  (*Id.*, citing Grombacher Decl. ¶ 80

12  [Doc. 84-1 at 20].)  Because the costs incurred are reasonable and do not exceed the amount

13  previously authorized, the request for litigation costs is **GRANTED** in the amount of $**4,747.10**.

14  **II.　　　Costs of Settlement Administration**

15  　　　　The Settlement authorizes the Settlement Administrator to receive "fees and expenses incurred

16  in administering the Settlement" from the Gross Settlement Amount, which was previously estimated

17  to be $30,000.  (Doc. 75-2 at 8-9, Settlement ¶ 25.)  Based upon the agreement, the Court ordered that

18  "[c]osts of settlement administration shall not exceed $30,000" in granting preliminary approval of the

19  Settlement. (Doc. 80 at 29.)  Razo now seeks approval of a payment of $27,047.00 to the Settlement

20  Administrator for its costs incurred.  (Doc. 85 at 9; *see also* Doc. 85-1 at 6, Bridley Decl. ¶ 15.)

21  　　　　Based upon the information provided regarding the tasks completed by the Settlement

22  Administrator— and the continuing responsibilities with the calculation of the settlement checks,

23  issuance and mailing of those settlement checks, and any necessary tax reporting on such payments—

24  the Court finds the requested Settlement Administration costs are reasonable.  Therefore, the request

25  for $**27,047.00** for the Settlement Administrator is **GRANTED**.

26  **CLASS REPRESENTATIVE PAYMENT**

27  　　　　A class representative may "receive a share of class recovery above and beyond [his] individual

28  claim" with a service payment, also known as an "incentive payment."  *China Agritech, Inc. v. Resh*,

138 S.Ct. 1800, 1811 n.7 (2018); *see also Staton*, 327 F.3d at 977 ("named plaintiffs … are eligible for reasonable incentive payments"). However, incentive payments for class representatives are *not* to be given routinely. The Ninth Circuit observed: "[i]f class representatives expect routinely to receive special awards in addition to their share of the recovery, they may be tempted to accept suboptimal settlements at the expense of the class members whose interests they are appointed to guard." *Staton*, 327 F.3d at 975 (citations omitted).

## I.        Awarding an Incentive Payment

The Ninth Circuit has emphasized that "district courts must be vigilant in scrutinizing all incentive awards." *Radcliffe v. Experian Info. Solutions*, 715 F.3d 1157, 1165 (9th Cir. 2013). In evaluating a request for an incentive payment to a class representative, the Court must consider: "'the actions the plaintiff has taken to protect the interests of the class, the degree to which the class has benefitted from those actions, the amount of time and effort the plaintiff expended in pursuing the litigation,' and any financial or reputational risks the plaintiff faced." *Named Plaintiffs & Settlement Class Members v. Feldman (In re Apple Inc. Device Performance Litig.)*, 50 F.4th 769, 786 (9th Cir. 2022) (quoting *Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1057 (9th Cir. 2019)); *see also Staton* 327 F.3d at 977. Further, incentive payments may recognize a plaintiff's "willingness to act as a private attorney general." *Rodriguez v. West Publ'g Corp.*, 563 F.3d 948, 958-59 (9th Cir. 2009).

The Settlement provides that Razo may apply "for [a] service payment of $10,000.00, to be paid out of the maximum Gross Settlement Amount." (Doc. 75-2 at 24, Settlement ¶ 24.) In addition, the parties agreed that if the Court declined to award the full amount, any funds not awarded will revert to the Gross Settlement Amount. (*Id.*) Razo asserts a service award is appropriate based upon: his time and effort prosecuting the case, personal risks undertaken, "his commitment to prosecuting the case in the best interests of the Class," the broad release of his claims, "and the important public policies that he helped to vindicate by stepping forward to be the class representative." (Doc. 83 at 6.) Thus, Razo now "requests that this Court approve the proposed service award of $10,000." (*Id.*)

### A.        Time expended

The Eastern District has awarded service payments for "substantial efforts taken as a class representative when the plaintiff has undertaken at least 30 to 40 hours of work." *Greer v. Dick's*

1   *Sporting Goods, Inc.*, 2020 WL 5535399, at *4 (E.D. Cal. Sept. 15, 2020) (internal quotation marks,

2   citation omitted); *see also Emmons v. Quest Diagnostics Clinical Laboratories, Inc.,* 2017 WL

3   749018, at *8 (E.D. Cal. Feb. 27, 2017) (awarding payments, and noting each plaintiff reported

4   spending "approximately 30-40 hours assisting their attorneys in the prosecution of this lawsuit"

5   [modification adopted]); *Rodriguez v. Kraft Foods Group, Inc*., 2016 WL 5844378, at *16 (E.D. Cal.

6   Oct. 5, 2016) (awarding payment to the class representative who conducted 40 hours of work on case).

7        Razo estimates that he "committed approximately 40 hours working with [his] lawyers on this

8   case."  (Doc. 83-1 at 6, Razo Decl. ¶ 19.)  However, Razo contends he spent additional time

9   "communicating independently with the class members" and performing independent research on the

10  claims, which would make the number of hours on the action "a whole lot higher."  (*Id.*)  Although the

11  Court is unable to speculate as to the amount of time Razo spent communicating with class members

12  or performing research, the reported hours weigh in favor of issuing an incentive payment.

13        **B.    Actions taken to benefit the class**

14        Razo asserts he "stayed in steady contact with Counsel and provided them with valuable

15  information and assistance in the prosecution of the case at each major stage."  (Doc. 83 at 7.)  He

16  reports he had "many phone calls, text messages, and email exchanges with [the] attorneys."  (Doc. 83-

17  1 at 3, ¶ 7.)  Further, Razo reports that during the course of the litigation:

18              [He] assisted in the drafting of pleadings; reviewed the PAGA notice and
                the Complaint before they were filed; searched for and produced
19              documents; conducted a close review of his wage statements over a period
                of four years; reviewed the numerous motions in filed in this case and
20              conferred with Counsel regarding strategy; reviewed the settlement
                documents in the *Wallack* action; communicated regularly with Counsel
21              and Class Members about the case; and reviewed and approved the final
                settlement papers.
22

23  (*Id.* at 10, citing Razo Decl. ¶¶ 7-19 [Doc. 83-1 at 3-5].)  Notably, Razo likely would have taken many

24  of these actions even if proceeding with individual claims.  On the other hand, by reviewing documents

25  and assisting with discovery, his actions undoubtedly benefitted Class Members, who will receive an

26  average payment of $65.90, despite the short liability period.

27        Razo also reports that he "strongly believed the termination of his employment as unlawful."

28  (Doc. 83 at 7, citing Razo Decl. ¶ 5 [Doc. 83-1 at 2].)  However, Razo declined to pursue a wrongful

termination claim and "instead remained committed to the class wage and hour claims that he had in common with the other class members." (*Id.*) Razo reports he also "declined to accept an individual settlement offer, which would have resulted in substantial recovery for himself, but left the members of the class with nothing." (*Id.*, citing Razo Decl. ¶¶ 5, 14 [Doc. 83-1 at 2, 4].) Accordingly, the actions taken on behalf of the class support a service payment to Razo.

### C.   Workplace retaliation and reputational risk

Razo is a former employee of AT&T. (Doc. 83-1 at 2, Decl. ¶¶ 3-4.) Razo notes the Southern District of New York has indicated "plaintiffs in the employment context 'face[] the risk that new employers would learn that they were class representatives in a lawsuit against their former employer and take adverse action against them. Moreover, each time they change jobs, they will risk retaliation in the hiring process.'" (Doc. 83 at 13, quoting *Asare v. Change Grp. N.Y., Inc*., 2013 U.S. Dist. LEXIS 165935, at *40; 2013 WL 6144764, at *15 (S.D.N.Y. Nov. 15, 2013).) In addition, the Southern District of New York observed: "the fact that a plaintiff has filed a federal lawsuit is searchable on the internet and may become known to prospective employers when evaluating the person." (Doc. 83 at 14, quoting *Guippone v. BH S & B Holdings, LLC*, 2011 WL 5148650, at *7 (S.D.N.Y. Oct. 28, 2011).)

Razo declares, "In becoming the named representative, I also faced the risk that initiating the case could potentially hurt my future employment possibilities with another employer because I'd be looked at as a troublemaker." (Doc. 83-1 at 2, ¶ 6.) Notably, if Razo elected file his *individual* claims rather than a class action, his name also would have been on the complaint as a named plaintiff. Regardless, any difficulty obtaining future employment due to Razo's status as a named plaintiff lacks evidentiary support and is speculative. The Ninth Circuit observed: "the trial court is not bound to, and should not, accept conclusory statements about 'potential stigma' and 'potential risk,' in the absence of supporting evidence." *See Wilson v. Telsa, Inc.*, 833 Fed. App'x 59, 62 (9th Cir. 2020) (quoting *Clark v. Am. Residential Servs. LLC*, 175 Cal. App. 4th 785, 805 (2009)). Thus, the Ninth Circuit determined a court did not abuse its discretion in reducing a requested class representative payment from $10,000 to $5,000 based on the speculative "risk of reputational injury." *Id.* Further, this Court observed previously that when a class representative was a former employee—as here—retaliation by the

1  defendant was not possible.  *See Torcia v. W.W. Grainger, Inc.*, 304 F.R.D. 256, 280 (E.D. Cal. 2014).

2  Accordingly, this factor does not support the requested service payment to Razo.

3  **D.    Financial risks**

4  Razo observes that he bore a financial risk, because "he bore the risk that he might have to pay

5  defense costs if he lost the case."  (Doc. 83 at 14, citing Razo Decl. ¶ 6 [Doc. 83-1 at 23].)  Courts in

6  the Ninth Circuit have repeatedly acknowledged such a financial risk supports an incentive payment to

7  a class representative.  *See, e.g., Vasquez v. Coast Valley Roofing, Inc.,*  266 F.R.D. 482, 491 (E.D. Cal.

8  2010) ("Class Representatives undertook the financial risk that, in the event of a judgment in favor of

9  Defendant in this action, they could have been personally responsible for any costs awarded in favor of

10  Defendant"); *Wilson v. Metals USA, Inc.*, 2021 WL 516585, at *9 (E.D. Cal. Feb. 11, 2021) (noting the

11  plaintiffs asserted that "by initiating this case, they assumed the risk of a judgment against them and

12  personal liability for an award of costs to defendant in the event of an adverse outcome, and finding the

13  identified risk "weighs in favor of granting an incentive award"); *Jones v. Abercrombie & Fitch*

14  *Trading Co*., 2018 U.S. Dist. LEXIS 198001, at *26 (C.D. Cal. Nov. 19, 2018) (considering the named

15  plaintiffs "assumed financial risk for paying costs if the case had been lost" in awarding service

16  payments); *Pierce v. Rosetta Stone, Ltd.*, 2013 WL 5402120, at *7 (N.D. Cal. Sept. 26, 2013) ("the

17  Class Representatives undertook a financial risk that, in the event of a judgment in favor of Defendant,

18  they may have been personally responsible for any costs awarded in favor of Defendant").  Thus, this

19  factor supports a service payment to Razo.

20  **E.    Willingness to act as private attorney general**

21  The Ninth Circuit observed that incentive payments may recognize a named plaintiff's

22  "willingness to act as a private attorney general."  *Rodriguez*, 563 F.3d at 958-59.  Here, Razo acted as

23  a private attorney general, which will result in payments to the LWDA and aggrieved employees under

24  PAGA.  (Doc. 83 at 7; *see also* Doc. 75-2 at 4, Settlement ¶ 6.)  Accordingly, this factor supports a

25  service payment for the class representative.

26  **II.    Reasonableness of Plaintiff's request**

27  Considering the factors set forth above—including the actions taken by Razo on behalf of the

28  class, the time expended, benefit received, financial risk, and wiliness to serve as a private attorney

44

general—an incentive award is appropriate.  In determining the amount to be awarded, the Court may

consider the actions undertaken by the class representative, the fairness of the hourly rate, and how

large the incentive award is compared to the average award class members expect to receive.  *See, e.g.,*

*Ontiveros v. Zamora*, 303 F.R.D 356, 366 (E.D. Cal. Oct. 8, 2014) (evaluating the hourly rate the

named plaintiff would receive to determine whether the incentive award was appropriate); *Rankin v.*

*Am. Greetings, Inc.*, 2011 WL 13239039, at *2 (E.D. Cal. July 6, 2011) (noting the incentive award

requested was "reasonably close to the average per class member amount to be received); *Alvarado*,

2011 WL 1883188 at *10-11 (considering the time and financial risk undertaken by the plaintiff).

Notably, a service payment of $5,000 for the class representative "is presumptively reasonable" in the

Ninth Circuit.  *Richardson v. THD At-Home Servs.*, 2016 WL 1366952, at *13 (E.D. Cal. Apr. 6, 2016);

*see also Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 266 (N.D. Cal. 2015) (observing that in

the Northern District, "a $5,000 payment is presumptively reasonable").

### A.  Actions of the class representative

In *Alvarado*, the Court noted the class representatives "(1) travelled from Bakersfield to

Sacramento for mediation sessions (2) assisted Counsel in investigating and substantiating the claims

alleged in this action; (3) assisted in the preparation of the complaint in this action; (4) produced

evidentiary documents to Counsel; and (5) assisted in the settlement of this litigation."  *Id.*, 2011 WL

1883188 at *11.  Also, the Court noted the plaintiffs "undertook the financial risk that, in the event of a

judgment in favor of Defendant in this action, they could have been personally responsible for the costs

awarded in favor of the Defendant."  *Id.*  In light of these facts, the Court found an award of $7,500 for

each plaintiff was appropriate for the time, efforts, and risks undertaken.

Likewise, in *Bond*, the Court found incentive payments of $7,500 were appropriate for the two

named plaintiffs who: "(1) provided significant assistance to Class Counsel; (2) endured lengthy

interviews; (3) provided written declarations; (4) searched for and produced relevant documents; (5)

and prepared and evaluated the case for mediation, which was a full day session requiring very careful

consideration, evaluation and approval of the terms of the Settlement Agreement on behalf of the

Class."  *Bond*, 2011 WL 2648879, at *15.  Similarly, the Northern District determined class

representatives failed to justify incentive awards of $10,000 although the plaintiffs reported "they were

involved with the case by interacting with counsel, participating in conferences, reviewing documents, and attending the day-long mediation that resulted in the settlement." *Wade v. Minatta Transport Co.*, 2012 U.S. Dist. LEXIS 12057, at *3 (N.D. Cal. Feb. 1, 2012).

Although Razo was not required to attend a mediation session, it appears his remaining actions are comparable to the plaintiffs in *Alvarado*, *Bond*, and *Wade*.  Despite being required to spend less time on this matter, Razo seeks an award that exceeds the awards approved for the class representatives in *Alvarado, Bond, and Wade.*  Accordingly, this factor does not support a conclusion that the service payment requested by Razo is fair or reasonable.

**B.     Fairness of the hourly rate**

Previously, courts have considered the hourly rate of compensation for a class representative. *See, e.g., Ontiveros*, 303 F.R.D. at 366; *Moss v. USF Reddaway*, 2018 WL 5099291, at *11 (C.D. Cal. Feb. 15, 2018); *Pappas v. Naked Juice Co of Glendora, Inc.*, 2014 WL 12382279, at *14-15 (C.D. Cal. Jan. 2, 2014). In doing so, the courts declined to issue service awards where the hourly rate for the tasks completed in the action was excessive or unreasonable.  *See, Ontiveros*, 303 F.R.D. at 366; *Moss*, 2018 WL 5099291, at *11; *see also Pappas, Inc.*, 2014 WL 12382279, at *14-15.

For example, this Court criticized a requested award because the award would have compensated the class representative "at a rate of $73.80 per hour."  *Ontiveros*, 303 F.R.D. at 366. In evaluating the reasonableness of the award, the Court noted Ontiveros was paid $15 per hour while employed by the defendant.  *Id.* at 366, n.3.  The Court explained that "[i]ncentive awards should be sufficient to compensate class representatives to make up for financial risk … for example, for time they could have spent at their jobs."  *Id.* at 366 (citing *Rodriguez*, 563 F.3d at 958-59.  The Court found an award of "$50 per hour fairly compensate[] the named plaintiff for his time," and rounded the $13,500 total up to $15,000 to "incorporate[] an extra incentive to participate in litigation."  *Id.*

Similarly, the Central District declined to approve service payments to the class representatives where the proposed amount resulted in "extremely high hourly rates."  *Moss*, 2018 WL 5099291, at *11. The court observed the requested award of $25,000 for each of the class representatives, Moss and Watkins, was "the equivalent of a payment of approximately $210 per hour Moss and $470 per hour Watkins."  *Moss*, 2018 WL 5099291, at *11.  Therefore, the court reduced the proposed award to

$14,000 to each class representative.  *Id.*

Razo reports that as a sales representative for AT&T, he was "paid an hourly rate but had the opportunity to and did receive other forms of compensation based on [his] sales performance and other incentives."  (Doc. 83-1 at 4, ¶ 11.)  However, Razo did not provide any information concerning his base hourly rate or estimate his regular hourly rate with the additional compensation for performance. (*See id.*)  The requested service payment to Razo—based upon the estimated 40 hours he spent on the matter—would result in an hourly rate of $250.  This hourly rate is clearly excessive.  *See Ontiveros*, 303 F.R.D. at 366; *Moss*, 2018 WL 5099291, at *11; *see also Pappas, Inc.*, 2014 WL 12382279, at *14-15 (reducing the service awards to $58 per hour for each class representative).  If the Court were to adopt the $50 hourly rate approved in *Ontiveros*, the service award would be reduced to $2,000.  Thus, this factor does not support a service payment in the amount requested.

### C.    Comparison of the award to those of the Class Members

The Ninth Circuit indicated the Court may consider the "proportion of the [representative] payment[s] relative to the settlement amount, and the size of each payment." *In re Online DVD-Rental Antitrust Litig.*, 779 F.3d 934, 947 (9th Cir. 2015); *see also Spann v. J.C. Penney Corp.*, 211 F. Supp. 3d 1244, 1265 (C.D. Cal. 2016); *see also Emmons*, 2017 WL 749018 at *9 (E.D. Cal. Feb. 27, 2017) (awarding class representative payments of $8,000, 14.5 times the average award and 0.3% of the gross settlement of $2.35 million); *Patel v. Trans Union, LLC*, 2018 WL 1258194, *3, 7-8 (N.D. Cal. Mar. 11, 2018) (awarding enhancement payment of $10,000, which was 25 times the average award and 0.125 % of the gross settlement).  For example, in *Rankin*, the Court approved an incentive award of $5,000, where the "[p]laintiff retained counsel, assisted in the litigation, and was an active participant in the full-day mediation."  *Id.*, 2011 WL 13239039, at *2.  The Court found the amount reasonable, observing "the sum is reasonably close to the average per class member amount to be received."  *Id.*

The requested award for Razo is more than 150 times the average award of $65.90 for Class Members.  (*See* Doc. 85-1 at 5, Bridley Decl. ¶¶ 13-14 [identifying the expected average award and the highest settlement share of $701.03].)  In addition, the requested award is approximately 1.74% of the gross settlement fund, which appears excessive.  *Compare with In re Online DVD-Rental Antitrust*

1   *Litig.*, 779 F.3d 934, 947 (9th Cir. 2015) (awarding $5,000 as a service payment, which was 0.17% of

2   the gross settlement fund); *Spann*, 211 F.Supp.3d at 1265 (awarding a class representative payment of

3   $10,000, which was approximately 100 times the average award and less than 0.25 percent of the gross

4   settlement).  Given the significant disparity between the average award and Razo's requested service

5   payment—as well as the percentage of the settlement fund— this factor does not support the amount

6   requested, and instead favors a reduction to the service award.

7       **D.**    **Plaintiff's comparison to other actions**

8       Razo observes that "[n]umerous courts in the Ninth Circuit have approved service awards of

9   $10,000 or more, including in cases which resolved at a similar stage of litigation."  (Doc. 83 at 9.)  In

10   support of this assertion, Razo cites the following:

11       *Watson v. Tennant Co.*, No. 2:18-CV-02462 WBS DB, 2020 WL
    5502318, at *7 (E.D. Cal. Sept. 11, 2020) (approving incentive payment of

12       $25,000 to a single named plaintiff); *Singer v. Becton Dickinson & Co.*,
    2009 WL 4809646, at *9 (S.D. Cal. Dec. 9, 2009) (approving $25,000

13       service award in two-and- a-half-year litigation in part because plaintiff
    spent considerable time on the action, conducted extensive informal

14       discovery and engaged in day-long mediation); *Curtis-Bauer v. Morgan
    Stanley & Co., Inc.*, 2008 WL 7863877, at * 1 (N.D. Cal. Oct. 22, 2008)

15       (approving $25,000 service award because plaintiff took risks in her career
    by coming forward and for effort she devoted to case); *Glass v. UBS Fin.

16       Servs., Inc.*, 2007 WL 221862, at * 17 (N.D. Cal. Jan. 26, 2007)
    (approving $25,000 service award to each of four class representatives

17       because of risk incurred by putting their names on complaint and engaging
    in extensive informal discovery); *see also Ontiveros v. Zamora*, 303

18       F.R.D. 356, 366 (E.D. Cal. 2014) (approving $15,000 service award).

19   (*Id.*)  However, Razo does not address the extent to which these cases are similar to the matter before

20   the Court, such as the time expended by the class representatives, tasks performed by the named

21   plaintiffs, or comparison of the service award to the gross fund and/or class payments.  (*See id.*)

22       Review of the actions cited reveals many differences when compared to the matter now

23   pending.  For example, in *Watson*, the plaintiff "spent significant time discussing the matter with

24   putative class members who later agreed to provide declarations in support of the putative class

25   claims" and the service payment of $25,000 was "less than three times the average award to individual

26   class members."  *Id.*, 2020 WL 5502318, at *7.  The Southern District approved a service payment of

27   $25,000 to Singer, observing he "spent more than 165 hours in connection with the prosecution and

28   settlement of the class action claims," including attending a full day of mediation.  *Singer v. Becton*

*Dickinson & Co.*, 2010 WL 2196104, at *9 (S.D. Cal. June 1, 2010).  In *Glass*, the service payments of $25,000 to each of the named plaintiffs was only 0.056% of the gross settlement amount of $45,000,000.  *See Glass*, 2007 WL 221862, at *1, 17.  Finally, where this Court awarded a service payment of $15,000 to Ontiveros, he reported working 271 hours on the action.  *Ontiveros*, 303 F.R.D. at 366.  In contrast, Razo identified only 40 hours on the matter, and his requested award is over 150 times the average payment.  Razo's reliance upon these actions is misplaced and the cases cited do not support a service payment of $10,000 to Razo.

## III.    Amount Awarded

A "substantial effort" by a plaintiff is necessary to support a service payment of $10,000.  *See Coburn v. City of Sacramento,* 2020 WL 7425345, at *8 (E.D. Cal. Dec. 17, 2020); *see also Amaro v. Gerawan Farming Inc*., 2020 WL 6043936, at *10 (E.D. Cal. Oct. 12, 2020) (awarding a payment of $10,000 to plaintiffs who spent over 370 hours each during the course of the litigation on tasks such as "talking to co-workers, assisting class counsel, attending the mediation, and organizing class members to keep them apprised of the status of [the] case"); *Valentine v. Rehab. Ctr. of Santa Monica Holding Co. GP, LLC,* 2021 U.S. Dist. LEXIS 243660, at *13-14 (C.D. Cal. Dec. 20, 2021) (finding the class representative failed to justify a service enhancement of $10,000, though the plaintiff reported 59.5 hours on the litigation, during which she "was deposed, worked closely with [class] counsel, assisted in the preparation of pleadings, provided factual information and assisted in identifying potential witnesses").

Because the factors discussed above support an incentive award— and the actions of Razo clearly benefited Class Members—a service payment is appropriate.  However, the amount requested is excessive.  As noted above, the application of a $50 hourly rate to the 40 hours reported by Razo would result in a service payment of $2,000.  On the other hand, Razo declined to pursue his wrongful termination claim and instead only proceeded with "wage and hour claims that he had in common with the other class members."  (Doc. 83 at 7.)  This Court indicated that a plaintiff sacrificing "the opportunity to bring several of his own claims" supported an increase to a service payment, even where it was "unclear whether those claims would have had merit."  *Ontiveros*, 303 F.R.D. at 366.  Thus, a moderate increase to the award is appropriate.  *See id.*

A service payment of $5,000 for Razo is appropriate in light of the time expended, tasks taken, benefit to the class, and the sacrifice of his own claim. *See Ontiveros*, 303 F.R.D. at 366; *see also Flores v. ADT LLC*, 2018 WL 6981043 (E.D. Cal. Mar. 19, 2018) (awarding the "presumptively reasonable" service payment of $5,000 to a plaintiff who "contributed between 50 and 55 hours in assisting in the prosecution"). Though this amount remains approximately 75 times higher than the average payment of $65.90 to Class Members, it is approximately 0.87% of the gross settlement fund, which is a more reasonable total than the amount requested. The Court finds the modified amount is fair, reasonable, and adequate. Thus, Razo's request for a service payment as class representative is **GRANTED** in the modified amount of **$5,000.00**.

## **CONCLUSION AND ORDER**

Based upon the foregoing, the Court finds the proposed class settlement is fair, adequate, and reasonable. The factors set forth under Rule 23 and Ninth Circuit precedent weigh in favor of final approval of the settlement agreement. Accordingly, the Court **ORDERS**:

1. Plaintiff's motion for final approval of the Settlement (Doc. 85) is **GRANTED**.

2. Certification of the Settlement Class is **GRANTED**, with the class defined as follows:

> All persons who either or both: (1) worked for AT&T Mobility Services LLC in the State of California, while classified as non-exempt, at any time from November 2, 2021, to September 21, 2022t; and/or (2) filed a timely Request for Exclusion from the class action settlement in the matter of Samuel *Wallack, et. al. v. AT&T Mobility Services, LLC*, Case Number CIVSB2117915, pending in the Superior Court for the State of California, County of California County of San Bernardino.

3. Pursuant to their requests, Kellen Shaw, Natasha Alaya, Isabel Ramos, Joshua Katzen, Sumanth Bharadwaj, and Cleveland Harris are **EXCLUDED** from the Settlement Class.

4. The PAGA award from the Gross Settlement Amount, including payment of **$7,500.00** to California's Labor and Workforce Development Agency, is **APPROVED**.

5. The request for a Class Representative service payment for Razo (Doc. 83) is **GRANTED IN PART,** in the modified amount of $**5,000.00.**

6. Class Counsel's motion for fees in the amount of 33 1/3% of the gross settlement fund—in the total amount of **$191,666.67**— (Doc. 84) is **GRANTED**.

7. Class Counsel's request for costs in the amount of **$4,747.10** is **GRANTED**.

8.      Settlement Administration costs in the amount of **$27,047.00**, to be paid from the Gross Settlement, are **APPROVED**.

9.      The action is **DISMISSED** with prejudice, with each side to bear its own costs and attorneys' fees except as otherwise provided by the Settlement and ordered by the Court.

10.     The Clerk of Court is **DIRECTED** to close this action.

11.     The Court hereby retains jurisdiction to consider any further applications arising out of or in connection with the Settlement.

IT IS SO ORDERED.

Dated:   **April 26, 2023**

UNITED STATES DISTRICT JUDGE

51